IN RE APPLICATION FOR REVOCATION OF CERTIFICATE OR LICENSE OF ELLWOOD RENO, SOMETIMES REFERRED TO AND KNOWN AS E. F. RENO, TO PRACTICE MEDICINE.

No. 3163

February 5, 1937.                    61 P. (2d) 1036.

*William S. Boyle,* for Appellant:

*Edward F. Lunsford* and *Myron R. Adams,* for Respondent:

## OPINION

By the Court, TABER, J.:

This is an appeal from an order of the Second judicial district court, Washoe County, affirming a decision of

the state board of medical examiners revoking appellant's certificate to practice medicine and surgery in the State of Nevada.

In August 1935, the chief of police of the city of Reno filed a complaint in the justice's court of Reno township charging appellant with a violation of that portion of section 10212 N. C. L. which provides that "any physician, or other person, knowing that any common prostitute is afflicted with any infectious or contagious venereal disease, who fails to immediately notify the police authorities of the town, city or place, where such prostitute is at the time of the discovery of the existence of such disease, is guilty of a misdemeanor." At the trial before a jury of twelve, appellant was found guilty, the verdict recommending leniency. Appellant (defendant in the justice's court) was sentenced to pay a fine of $250. He paid the fine and did not appeal.

In September 1935, the district attorney of Washoe County filed a complaint against appellant with the state board of medical examiners, praying that appellant's certificate to practice medicine and surgery be revoked. This complaint charged that appellant had been guilty of unprofessional conduct in two particulars: (1) Willful disobedience of the law; and (2) conviction of an offense involving moral turpitude. Section 4101 N.C.L., as amended, Statutes of Nevada 1931, c. 206, pp. 346, 347, provides in part that the board of medical examiners "may refuse a certificate to any applicant guilty of unprofessional conduct, and may revoke any certificate for like cause. The words 'unprofessional conduct,' as used in this act, are declared to mean: * * * Willful disobedience of the law, or of the rules and regulations of the state board of health; conviction of any offense involving moral turpitude." The district attorney's complaint charged that appellant's willful disobedience of the law consisted in his violation of said provision of section 10212 N. C. L., and further charged that the offense of which appellant was convicted in the justice's court, as aforesaid, was one involving moral

turpitude. After a hearing on said charges the board of medical examiners on the 3d day of February 1936, revoked appellant's certificate to practice medicine and surgery in the State of Nevada. Appellant petitioned the district court to review said decision, and that court, after doing so, affirmed the decision of the board. Said proceedings in the district court were had pursuant to the following provision of section 4101 N. C. L, as amended, Statutes of Nevada 1931, c. 206, p. 348: "In all cases where a certificate is revoked the decision of the board resulting in such revocation, together with a transcript of the findings, shall be filed with the clerk of the district court of the county in which the certificate to practice has been recorded. Any person whose certificate has been revoked may, within sixty days after filing of said certified copy of said decision and findings, petition said district court to review said decision or to reverse or modify, and upon such review the burden shall be upon the petitioner to show wherein such decision is erroneous or unlawful." It is from said district court order affirming the decision of said board that this appeal has been taken.

Appellant contends that the action of the board of examiners was and is wholly void for two reasons: First, that the word "law" as used in the expression "willful disobedience of the law" (section 4101 N. C. L., as amended) is limited in its meaning to laws included in the act to create a state board of health, sections 5235–5276 N. C. L. Second, that the offense of which he was convicted in the justice's court was not one involving moral turpitude.

With reference to the first contention, we are not called upon to decide whether the board of examiners would have the power to revoke a physician's certificate upon the ground that he had willfully violated, let us say, some provision of the state fish and game law. We do hold, however, that willful disobedience of the statute requiring immediate report by a physician of a prostitute afflicted with a contagious or infectious venereal

disease comes within the meaning of "willful disobedience of the law," as those words are used in said section 4101 N. C. L., as amended, and that the word "law" in the above-quoted clause does not refer exclusively to the said act creating a state board of health. Notifying the police authorities of a prostitute afflicted with a contagious or infectious venereal disease is a matter directly connected with the professional conduct of a physician.

Whether the misdemeanor of which appellant was convicted in the justice's court was an offense involving moral turpitude depends, in our opinion, upon the circumstances under which it was committed. It is easily conceivable that a physician of the most ethical type, knowing a prostitute to be afflicted with such a disease, and being about to report the case immediately to the police authorities, might have his attention distracted, before actually doing so, by reason of some emergency, and then forget the matter for several days. Under such circumstances the fact that he unintentionally overlooked reporting the case to the police authorities would not be a defense in a prosecution under the provision of said section 10212 N. C. L., because the mere failure to notify the police authorities immediately constitutes the offense, regardless of whether such failure be willful, intentional, or otherwise. No moral turpitude, however, would be involved in such a case.

It seems to us that whether the conduct complained of by the district attorney before the board of examiners constituted willful disobedience of the law depends to a large extent upon the same considerations as the question whether the offense of which appellant was convicted in the justice's court was an offense involving moral turpitude. The offense defined in section 10212 N. C. L. does not necessarily involve moral turpitude, nor is disobedience to that law necessarily willful. The important questions, therefore, are whether appellant's disobedience to the aforesaid provision of

section 10212 N. C. L. was willful and whether the offense of which he was convicted in the justice's court was committed under such circumstances as to involve moral turpitude.

■ We cannot go behind the verdict of the jury for the purpose of ascertaining whether appellant's conviction in the justice's court was supported by the evidence. Appellant had the right to appeal to the district court and there have the charge against him tried de novo. Having paid his fine, however, and not having appealed, the district court on review was, and this court on appeal is, foreclosed from any inquiry as to whether the evidence at the trial in the justice's court was sufficient to support the verdict of the jury.

■. The law does not permit the board of examiners to arbitrarily revoke a certificate to practice medicine or surgery. On the other hand, this court will not reverse the order appealed from, if there was substantial evidence to support it, unless it be clear that a wrong decision was reached. It thus becomes proper to set forth in substance some of the testimony given at the hearing before the state board of medical examiners.

Carl N. Broberg, police officer located at the restricted district, testified that on August 10, 1935, B—— N——, the prostitute who figures in this case and who will henceforth be designated B. N., handed him a certificate reading as follows: "I have examined" (stating her name) "this date and find no evidence of venereal disease. Date: August 10, 1935. E. F. Reno, M. D."

Mrs. Vera L. Young, acting director of the University of Nevada hygienic laboratory, testified that on Tuesday, August 6, 1935, the laboratory received a blood specimen of B. N. from appellant, and that a Wassermann test (Kolmer's technique) was made on the following Thursday, August 8, and the report completed the next day, Friday, August 9. Basing her testimony on a laboratory custom of many years, she stated further that the report was mailed to Dr. Reno before

noon of the last-mentioned day. The result of the test was a 4–plus (very strongly positive), indicating syphilis, "and, of course, the clinical picture and the physician would complete the picture." The test was repeated with the same result. A copy of the report was delivered to the chief of police some time after August 6.

Lou W. Gammell, chief of police, testified that B. N. "worked" in the restricted district during August 1935, but that he had had no report from Dr. Reno with respect to her being afflicted with any venereal disease and that none of the police officers had informed him that such a report had been made. He further stated that since he had been chief of police, reports of prostitutes afflicted with venereal diseases had been received by him both before and after the B. N. case.

Dr. Byron A. Caples, physician and surgeon, testified that B. N. first came to his office on August 17, 1935, having been referred to him by the chief of police. He made a test at that time, the office examination disclosing that she was suffering from gonorrhea. After being advised of the result of the laboratory Wassermann test hereinbefore referred to, he started in checking her again. As a result of his examination, he gave it as his opinion that B. N. was afflicted with a case of syphilis of several years' standing. Dr. Caples further testified that on said August 17, after being advised by B. N. that she had been under the care of appellant, he called the latter on the telephone, "and he stated to me he had received a 4–plus Wassermann report from the state laboratory on August 9, and that since that time he had given her four injections of salvarsan, and had refused to give her a card to go to work." Dr. Caples' testimony showed that he is a specialist in general urinary diseases and urology, and that in his twelve years of practice in Reno he had treated about thirty prostitutes for syphilis or gonorrhea. He reported every such case to the police authorities after Mr. Gammell became chief of police. Prior to that time he did not report any of them because he "could not get any cooperation,"

because it was "not customary" and because the only cooperation he had been able to obtain from the officials was that the girl was given a floater—this latter procedure being one in which Dr. Caples does not believe because the result is to send infected girls to other towns to carry on. Dr. Caples testified further that he had no knowledge of any doctor in Reno, except in the instant case, having reported a prostitute as not having a venereal disease when in fact she did have such a disease. With reference to the telephone conversation with appellant on August 17, 1935, Dr. Caples testified that within ten minutes after that conversation he made notes of it and in giving his testimony before the board of examiners he made use of those notes. Without the notes he says he would not have been able to remember that appellant told him that he (appellant) received the laboratory Wassermann test report on August 9.

Appellant testified that he had been practicing his profession in Reno for about six years; that B. N. first came to his office about the third day of August 1935, to get a certificate so she could go to work in the restricted district; that she was drunk; that he ran a slide on her and found no definite evidence of active gonorrhea; that he did not at that time get a blood specimen for two reasons: First, because the girl got to screaming on account of the pain; and, second, because he understood that a Wassermann test taken during an alcoholic spree is not entirely reliable; that he gave her a card which would enable her to carry on her business in the restricted district, and told her to come back in two days after she had sobered up; that it was several days later when she returned and he then reexamined her and took a blood specimen which he sent to the state laboratory from which the 4–plus Wassermann report came back to him later; that he did not tell Dr. Caples that said report was received by him on August 9, but that the report was dated August 9; that he could not, eight days after receiving such a report, remember the date on which it was in fact received; that he was looking

at the report at the time he was talking to Dr. Caples over the telephone; that his aunt, who was his office secretary, opened these reports and filed them with the patient's card; that he did not see that report on Friday the 9th; that he did not believe there was a practicing physician in Reno, except those who got their mail in a post-office box, who would receive a laboratory report on Friday afternoon which had been mailed Friday morning; that those reports usually came in on Saturdays, but that he did not see that report on Saturday; that the report was filed with B. N.'s card and, while it might have been negligence on his part, he did not see that report on Saturday; that on that day (Saturday, August 10) he examined her again and gave her another card so she could carry on her business in the restricted district; that on the following Monday, August 12, the report was called to his attention when he was going through the cards and he then called B. N. on the phone and told her to come to his office, which she did; that he then told her about the laboratory report and informed her that he could not give her any more cards, and that she should quit work and "go down there and tell them you have got something wrong with you. * * * You have a card there that has six days to run yet because I have given you a card on Saturday, but now this is knowledge brought to me on Monday, and I can't give you any more cards. The best thing for you to do is to go down and tell them." Appellant further testified that B. N. was not around Reno at the time he was giving his testimony. He further testified that on Monday, August 12, he went to the office of Dr. Adams, then acting as city health officer, and informed him about the diseased prostitute and filed out a written report which he left with Dr. Adams. This report was filled out on a board of health card containing a printed list of reportable diseases, among which neither gonorrhea nor syphilis was included. "Wassermann * * * was filled in in typewriting, as were also the age of the prostitute, to wit, 16, and the date, August 12, 1935. The name of

the patient was not filled in on the card because, as appellant testified, he did not think it was the thing to do. Appellant testified that he told Dr. Adams the case was one in the restricted district. Dr. Adams, according to appellant, stated that he had been city health officer for thirteen years, but that no such case had ever been reported to him. Appellant introduced in evidence a blank form of city health officer's weekly report to the state board of health, which contained a list of reportable diseases, not including gonorrhea or syphilis. He testified that he did not issue any more cards to B. N. after he knew she was afflicted with syphilis. When asked why he gave her a clear card on August 10, when he had the test pending in the laboratory, appellant replied: "That test is not absolutely positive, but there was no clinical evidence of syphilitic lesions and on the case I took the clinical evidence and gave the card. A Wassermann test is only in support of it, and it must be supported with the clinical evidence and the clinical history." Appellant testified further that when he issued B. N. a clear card on Saturday, August 10, he felt morally certain that she did not have a venereal disease; that there was no clinical evidence of syphilis, and on that basis he issued her the card, but that when he saw the laboratory report he immediately proceeded to do everything he could that he thought was right to do. It was early in the morning of Saturday the 10th, according to appellant, that B. N. came to his office and he testified that at that time he had not seen the laboratory report. When asked why he took a blood specimen if there was no clinical evidence of venereal disease, appellant replied that he presumed it was the proper thing to do in issuing the clear cards. "It says, 'must be free from venereal disease,' and it is routine matter to run that, and I ran it." Appellant also testified that the medical profession depends a great deal upon the blood reaction, that they regard it as positive, and that it is the general consensus of opinion that a strong positive Wassermann is regarded as very conclusive. When

asked whether he could not have called the state hygienic laboratory to get a report on the case before issuing the clear card to the prostitute on August 10, appellant replied, "Oh, perhaps I could, but I just did not do it, and that was all." He said that the B. N. case was the first case of that kind he ever had. When appellant learned that B. N. was afflicted with syphilis, he felt, according to his testimony, that there must be something to do about it, and that as he had not handled that type of cases he thought the place to find out was from the city health officer.

Appellant introduced in evidence an ordinance of the city of Reno prescribing the duties of the health officer. Amongst other things, this ordinance provided that the health officer shall see that all laws and ordinances relating to the health and sanitary condition of the city of Reno and the regulations and orders of the board of health are strictly enforced and observed. "He shall have the power of a police officer in the enforcement of all sanitary laws, ordinances and regulations of said Board of Health and of said City."

Dr. A. F. Adams testified that he had been city health officer of Reno in August 1935, and for many years prior to that time; that appellant had brought in a card to him and reported syphilis on it; that no other doctor had ever reported such a case to him; that the card on which the report was made was one provided by the state board of health; that at the time appellant made this report he told witness the name of the girl, and that he believes B. N. was the one.

Seth W. Longabaugh, called as a witness by appellant, testified in part that he was foreman of the jury which brought in the verdict in the justice court trial hereinbefore referred to; that the verdict was a compromise; that the first ballot was seven for conviction and five for acquittal; that some of the jurors seemed to think, from the testimony that was introduced, that Dr. Reno was not the only guilty doctor in Reno and, therefore, it was more persecution than prosecution; that the

police chief reported there was no record of anybody ever reporting a case; that the jurors were in fear that Dr. Reno would be deprived of his license; that the jurors "wanted leniency shown by the court in assessing the final fine"; that the jurors, in finding appellant guilty, were not influenced so much by the fact that he had reported to the health officer instead of to the chief of police as they were by the fact, as they concluded, that the report was not made "in due time," not made "when it should have been."

We have already seen that in a case of this kind the district court, on review of a decision of the board of medical examiners, may affirm, reverse or modify such decision. In the first part of said section 4101 N. C. L., as amended, it is provided that the board may revoke a physician's certificate for unprofessional conduct. Later in the same section it is provided that if the board, after hearing charges of unprofessional conduct, is satisfied that the person charged is guilty, his certificate shall be revoked. Section 28 of the 1935 new trials and appeals act, Statutes of Nevada 1935, c. 90, pp. 202, 203, provides in part that "Upon an appeal from a judgment or order, the appellate court may reverse, affirm, or modify the judgment or order appealed from, in the respect mentioned, in the notice of appeal, and as to any or all of the parties; and may set aside, or affirm, or modify, any or all of the proceedings subsequent to or dependent upon such judgment or order, and may, if necessary or proper, order a new trial, or that further action or proceedings be had in the lower court without a new trial, and may remand the case for such further action or proceedings only."

■■ Because there is substantial evidence to support the findings of the board of medical examiners and the order of the district court affirming the decision of said board, we will not reverse the order appealed from. We are disposed, however, to modify the order, for, while not approving appellant's issuance of a clear card to the prostitute on August 10, 1935 (an act which is

not charged against him in the district attorney's complaint), we entertain some doubt as to whether appellant's failure to immediately report her to the police authorities, though a misdemeanor, was an intentional violation of section 10212 N. C. L., and as to whether said failure to make immediate report, in view of all the circumstances, involved moral turpitude. If we could feel clear that the conduct complained of was willful and intentional, we would affirm the order appealed from in all particulars. In the case of State Board of Dental Examiners v. Savelle, 90 Colo. 177, 8 P. (2d) 693, 82 A. L. R. 1176, it was held that the power to revoke permanently includes the power to revoke temporarily, i. e., to suspend. Under all the circumstances of the instant case, we are of the opinion that the revocation of appellant's certificate should have been temporary rather than permanent. Appellant's certificate was revoked on February 3, 1936, and we assume that he has not been practicing medicine or surgery since that time. We think the demands of justice have already been met in this case, and it is therefore adjudged that said revocation of appellant's certificate to practice medicine and surgery shall terminate on the filing of this opinion, and that appellant may resume such practice from and after this 5th day of February 1937. The order appealed from is modified accordingly, and affirmed in all other respects.

■ Appellant contends that he did not have a fair hearing before the board of medical examiners for the reason that he was not allowed to question the members of the board for the purpose of learning whether there was any prejudice in their minds against appellant. There is no merit in this contention. Brinkley v. Hassig (C. C. A.), 83 F. (2d) 351, 357; Winning v. Board of Dental Examiners, 114 Cal. App. 658, 300 P. 866, 868; Dyment v. Board of Medical Examiners, 93 Cal. App. 65, 268 P. 1073.

■ Appellant was entitled to a fair hearing before

the board of medical examiners, and, in our opinion, the hearing was a fair one. In one respect, at least, the board was more than fair to appellant, namely, in permitting, over objection, testimony concerning the deliberations of the jury in the justice's court trial. It is true that on such a hearing before the board of medical examiners guilt must be clearly established and the intendments are in favor of the accused physician. Schireson v. Walsh, 354 Ill. 40, 187 N. E. 921, 923. And as has been stated, the board is not authorized to arbitrarily revoke the certificate of a physician and surgeon. We have studied the record most carefully, with the result that we find nothing arbitrary or capricious in the board's decision.

The evidence clearly shows that syphilis is an infectious and contagious disease within the meaning of said section 10212 N. C. L.

Appellant has questioned the authority of the district court to review the findings of the board of medical examiners. In our opinion, this contention is without merit. Besides, it was appellant himself who invoked the jurisdiction of the district court.

We deem it proper to commend the police authorities and state board of medical examiners for the efforts they are making to enforce such laws as the one which has figured in this case.

The respective parties will pay their own costs.