JAMES F. SLOAN, Appellant, *v.* STATE BAR
OF NEVADA, Respondent.

No. 16786

October 8, 1986 726 P.2d 330

*Paul A. Richards,* Reno, for Appellant.

*Clark J. Guild, Jr.,* Chairman, Northern Nevada Disciplinary
Board, and *Michael Barr,* Bar Counsel, Reno, for Respondent.

## OPINION

*Per Curiam:*

The State Bar of Nevada has recommended that attorney James F. Sloan be suspended from the practice of law for a period of nine months and that he be assessed the costs of the disciplinary proceedings. Sloan appeals from this recommendation, asserting that the Board's recommendation was in error. For the reasons set forth below, we agree.

### FACTS

Attorney James Sloan has practiced law in Nevada since 1966. Between 1971 and 1980, Sloan rendered legal advice and acted as counsel in various capacities and on various occasions for Sheldon Lamb and Ivan Brinkerhoff. Lamb and Brinkerhoff were both involved in the ranching business in Dixie Valley, near Sloan's family ranch.

On August 8, 1980, Lamb and Brinkerhoff went to Sloan's office together, and Brinkerhoff requested Sloan to prepare a bill of sale for a tractor his company, Brinkerhoff Seed Farms, Inc., wished to purchase from William Larson. Brinkerhoff advised Sloan at this time that he was going to purchase the tractor from Larson for $42,000 in cash, and that Sloan could take $2,000 for himself as his fee for representing Brinkerhoff in this matter.

Sloan testified at the disciplinary hearing below that he was concerned about whether a problem existed with the transaction because of Brinkerhoff's desire to deal with cash only, but Brinkerhoff and Lamb both assured Sloan there was no problem. Sloan also testified that although he believed the $2,000 fee was some what excessive for his services in this particular matter, he nevertheless believed the fee was justified in light of previous work he had done for Brinkerhoff for which he had received no compensation. Finally, Sloan testified that he did not know William Larson, the seller of the tractor, at the time he drafted the bill of sale.

On August 15, 1980, Brinkerhoff and a man posing as William Larson executed the bill of sale with Sloan's assistance in Sloan's office. According to Sloan, Lamb introduced Sloan to the man who was posing as Larson, and Sloan believed the man was in fact William Larson.

Approximately two months later, however, in October of 1980, Lamb informed Sloan that the man who had executed the bill of sale as William Larson was, in fact Michael Anderson, Lamb's former son-in-law. Lamb further advised Sloan at this time that the tractor which had been the subject of the sale had previously been stolen. According to Sloan, Lamb led him to believe at this time that both Lamb and Brinkerhoff had been involved in a fraudulent scheme concerning the sale of stolen farm equipment.

Sloan did not contact the authorities about the information he received from Lamb. Sloan, however, was later approached by the Washoe County District Attorney's Office about the sale of the stolen tractor, and Sloan then explained to the District Attorney that he had not known the tractor was stolen at the time he prepared the bill of sale. Sloan further explained that he had not gone to the authorities with the information he received from Lamb in October, because he believed the information was "confidential." Nevertheless, on August 8, 1980, the District Attorney's Office obtained a grand jury indictment against Sloan, charging him with one count of forgery of conveyance, a felony in violation of NRS 205.115. The indictment charged Sloan with having intentionally and knowingly assisted in procuring Mike Anderson's fraudulent signature as William Larson on the bill of sale for the tractor. The indictment also charged Mike Anderson and Sheldon Lamb with forgery of conveyance for their participation in the execution of the bill of sale.

Sloan later moved to have the charge against him severed from the charges against Lamb and Anderson, but the district court denied the motion. Sloan then became concerned about the adverse publicity he was receiving as a result of the charge against him, and he feared that the public would improperly

associate him with Lamb and Anderson as a result of the trial court's failure to sever the charges. Consequently, Sloan engaged in plea negotiations with the District Attorney's Office. Ultimately, Sloan agreed to plead nolo contendere to one count of "conspiracy to commit the crime of being an accessory to a forged conveyance," a gross misdemeanor. The plea was entered pursuant to North Carolina v. Alford, 400 U.S. 25 (1970), with Sloan refusing to admit his guilt.[1] Additionally, the plea was specifically based on Sloan's failure to disclose the fraudulent nature of the transaction when he learned of it in October, and was not based on any wrongdoing on Sloan's part with regard to the transaction itself. Following his plea, the district court fined Sloan $500.

On November 21, 1984, the State Bar of Nevada petitioned this court pursuant to SCR 111 to suspend attorney Sloan temporarily from the practice of law pending the final disposition of bar disciplinary proceedings against Sloan.[2] The State Bar argued that the temporary suspension was warranted, on the ground that Sloan had been convicted of a "serious crime," as defined in SCR 111(2). This court, however, concluded that a substantial question existed as to whether Sloan's conviction did in fact constitute a conviction for a serious crime within the meaning of SCR 111(2). Accordingly, we refused to suspend Sloan's license temporarily, and we directed the Disciplinary Board to determine whether Sloan was in fact convicted of a serious crime warranting suspension or other discipline.

Following a hearing on the matter, the Disciplinary Board found that Sloan had indeed been convicted of a "serious crime,"

---

[1]In *Alford,* the Supreme Court held that a defendant is constitutionally entitled to enter a plea of guilty or nolo contendere while at the same time asserting his innocence. The Court noted that a defendant may have a legitimate reason other than guilt for entering such a plea, such as where the defendant, "though believing in . . . his innocence, might reasonably conclude a jury would be convinced of his guilt and that he would fare better in the sentence by pleading guilty. . . ." *Alford,* 400 U.S. at 33 (citation omitted).

[2]SCR 111 provides in part:

(1) Upon the filing with the supreme court of a certificate of conviction demonstrating that an attorney has been convicted of a serious crime, as defined in this rule . . . the court shall enter an order suspending the attorney . . . pending final disposition of a disciplinary proceeding, which shall be commenced by the appropriate disciplinary board upon notice of conviction. . . .

(2) The term "serious crime" means (1) a felony and (2) any crime less than a felony a necessary element of which is . . . improper conduct of an attorney, interference with the administration of justice . . . misrepresentation, fraud . . . deceit . . . or an attempt or a conspiracy or solicitation of another to commit a "serious crime."

and recommended that Sloan be suspended from the practice of law for a period of nine months, and that he be assessed the costs of the disciplinary proceedings. This appeal followed.

## DISCUSSION

On appeal Sloan contends, among other things, that the Board erred by concluding that the offense of which he was convicted constituted a serious crime. For the reasons set forth below, we agree.

SCR 111(2) defines a "serious crime" as being any felony, or any crime less than a felony a necessary element of which is "improper conduct as an attorney, interference with the administration of justice . . . misrepresentation, fraud . . . deceit . . . or an attempt or a conspiracy or solicitation of another to commit a 'serious crime.' " In the proceedings below, counsel for the State Bar argued that Sloan's conviction was based on fraudulent conduct committed by Sloan. Specifically, counsel argued that Sloan was aware at the time he prepared the bill of sale for Brinkerhoff that a fraud was being committed, and that Sloan was therefore a knowing participant in the fraudulent act. The evidence in the record, however, clearly indicates that Sloan did not have knowledge of the fraudulent act until at least two months later when he was contacted by Lamb and advised of the stolen nature of the farm equipment and of the fact that Michael Anderson had posed as William Larson. Further, Sloan's *Alford* plea was specifically based on his failure to report the fraud rather than on his active participation in the fraud. Finally, we note that during the oral argument of this appeal, State Bar counsel conceded that Sloan, an unknowing participant in the fraud, was "unwittingly" used by Anderson and Lamb to commit the fraud. Accordingly, we conclude that Sloan was not guilty of any fraudulent behavior.

The State Bar, however, contends that appellant's conviction should be viewed as a "serious crime" warranting suspension simply because the crime to which Sloan pleaded guilty was denominated a "conspiracy." The Bar apparently believes that the mere labeling of the crime as a conspiracy warrants suspension regardless of the underlying facts of the offense. We disagree.

In a disciplinary proceeding, it is the duty of this court to look beyond the label given to a conviction in order to determine whether the underlying circumstances of the conviction warrant discipline. *See generally* In re Cochrane, 92 Nev. 253, 549 P.2d 328 (1976). Looking to the true nature of the facts as conceded by the State Bar, it is apparent that Sloan did not engage in a

conspiracy, nor did he ever admit to a conspiracy when he entered his plea. In fact, it appears that Sloan did not engage in any criminal conduct whatsoever, and that Sloan actually entered a plea to a non-existent offense. Specifically, we know of no statute, and Bar counsel has pointed to none, which would make it an offense to fail to disclose to the authorities that a crime has taken place. Accordingly, under the circumstances of this case, we must conclude that the Board erred by concluding that Sloan was convicted of a serious crime within the meaning of SCR 111(2).

The State Bar alternatively contends that, regardless of whether the crime to which Sloan pleaded guilty was a "serious crime," Sloan's license to practice law should be suspended because Sloan violated an ethical rule when he failed to disclose the existence of the fraudulent transaction after he learned of it from Lamb. Sloan, on the other hand, contends that he had, or in good faith believed that he had, an ethical obligation to Lamb and Brinkerhoff not to reveal the fraud. We believe this issue is at the heart of the question of whether Sloan deserves to be disciplined.

Normally, all confidential communications between a client and his attorney are considered "privileged," and the client, or the attorney acting on behalf of the client, may refuse to divulge the nature of the communication. *See generally* NRS 49.095. Moreover, under former SCR 179, which was in effect at the time of the alleged offense, an attorney had an affirmative duty to "preserve his client's confidences," except where the client advised the attorney that he intended to commit a crime. *See* former SCR 179.[3] Under this rule, Sloan was justified in believing that he was prohibited from divulging information he received from his client indicating that the client had already committed a crime. *See, e.g.,* United Services Automobile Association v. Werley, 526 P.2d 28 (Alaska 1974); A. v. District Court of

---

[3]Former SCR 179 provided as follows:

1. It is the duty of a member of the state bar to preserve his client's confidences and this duty outlasts the lawyer's employment. The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of employment from others in matters adversely affecting any interests of the former client and concerning which he has acquired confidential information, unless he obtains the consent of all concerned.

2. A member of the state bar accused by his client can disclose the truth in respect to the accusation. *The announced intent of the client to commit a crime is not included within the confidences which he is bound to respect.* He may properly make such disclosures as may be necessary to prevent the act or protect those against whom it is threatened. (Emphasis added.)

Second Judicial District, 550 P.2d 315 (Colo. 1976); State v. Phelps, 545 P.2d 901 (Or.Ct.App. 1976).

The State Bar, however, argues that the above rule was not applicable to the information Sloan received from Lamb because Sloan was not representing Lamb in connection with the fraudulent sales transaction and because Lamb was therefore not Sloan's client for purposes of SCR 179. The State Bar asserts, therefore, that the communication between Lamb and Sloan was not privileged. While it is true that Brinkerhoff rather than Lamb was Sloan's client for the specific purpose of drafting the bill of sale, Sloan nevertheless could have reasonably believed that Lamb was his client for purposes of asserting a privilege at the time Lamb communicated the nature of the fraud to Sloan. First, Sloan had acted as Lamb's counsel and had given Lamb legal advice on various occasions for a period of almost ten years prior to the communication. Further, when Lamb called Sloan, Sloan could reasonably have believed that Lamb intended to call upon Sloan for legal advice if Lamb were ever criminally charged in the matter. In fact, we note that Lamb did request Sloan to represent him in a related criminal matter shortly after Lamb revealed the fraud to Sloan.

Moreover, we note that in his conversation with Sloan, Lamb implicated Brinkerhoff as being a direct and knowing participant in the fraudulent transaction. Sloan therefore could have reasonably concluded that he was protecting Brinkerhoff, as his client in this particular transaction, by not divulging the information he received from Lamb regarding the transaction. Accordingly, we conclude that Sloan was justified in believing that the communication he received from Lamb was intended as a confidential client communication.

The State Bar contends, however, that regardless of whether Lamb's phone call to Sloan can be viewed as a client communication, Sloan nevertheless had an independent duty to disclose the fraud, because Sloan had been used as an "instrument" in the fraudulent transaction. In this regard, the State Bar relies on NRS 49.115(1), which provides that an attorney-client communication is not privileged when the client sought or obtained the services of a lawyer "to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." The import of this rule, however, is to prevent a *client* from being able to assert an attorney-client privilege for communications made to his attorney for purposes of using the attorney to commit a fraud on a third person. The rule does not

place an affirmative duty of an attorney to disclose information received in the course of such a communication. Moreover, in view of the broad dictates of former SCR 179, which did place an affirmative duty on an attorney to preserve virtually all client confidences, an attorney faced with deciding whether he was obligated to reveal a fraud of this nature could have justifiably concluded that former SCR 179 prohibited him from revealing the communication.

Finally, at the oral argument in this matter, the State Bar directed our attention to the fact that former SCR 179 was repealed in 1986 and that SCR 156 was enacted in its place. SCR 156 now provides that an attorney shall not reveal information received from a client with two exceptions. First, the attorney "shall" reveal all information reasonably necessary to prevent the client from committing a violent crime. Second, the rule states that the attorney "may" reveal information the attorney "reasonably believes necessary . . . [t]o prevent or rectify the consequences of a client's criminal or fraudulent act in the commission of which the lawyer's services have been used, but the lawyer shall, where practicable, first make reasonable effort to persuade the client to take corrective action. . . ."

Initially, we note that the ethical rule set forth in SCR 156 cannot be applied to Sloan's case because SCR 156 was enacted long after the communication in this case took place. Nevertheless, even assuming we were to apply this rule to Sloan's case, we note that the rule leaves to the discretion of the attorney the decision of whether to disclose a fraud of this nature. This rule does not place an affirmative duty on an attorney to disclose such a fraud, and therefore, even under this rule, Sloan at most could have been accused of exercising poor judgment in determining not to disclose the information he received from Lamb. This court has repeatedly held that when a professional commits an isolated instance of negligent behavior, with no intent to violate a rule or proscription, suspension of his or her professional license is inappropriate. *See* In re Francovich, 94 Nev. 104, 575 P.2d 931 (1978); In re Kellar, 88 Nev. 63, 493 P.2d 1039 (1972); Flanders v. State, Dep't of Commerce, 87 Nev. 303, 486 P.2d 499 (1971); In re Reno, 57 Nev. 314, 61 P.2d 1036 (1937); In re Miller, 55 Nev. 444, 38 P.2d 972 (1934). If Sloan is deserving of any punishment whatsoever, and we are not convinced that he is so deserving, we believe the demands of justice have already been served by the punishment Sloan received through the criminal justice system. *See* In re Ross, 99 Nev. 657, 668 P.2d 1089 (1983); Flanders v. State, Dep't of Commerce, *supra;* In re Reno, *supra.*

Accordingly, we decline to impose on Sloan the discipline recommended by the Disciplinary Board.

It is so ORDERED.