**UNITED SERVICES AUTOMOBILE ASSOCIATION, Petitioner,**

v.

**Harley D. WERLEY et al., Respondents.**

**No. 2082.**

Supreme Court of Alaska.

Sept. 9, 1974.

---

Hugh B. White, John H. Bradbury, Anchorage, for petitioner.

Joseph L. Young, Atkinson, Conway, Young, Bill & Gagnon, Anchorage, for respondent Harley D. Werley.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, and FITZGERALD, JJ.

RABINOWITZ, Chief Justice.

This petition seeks review of a superior court discovery order directing the production of various documents. The basis for review urged by petitioner United States Automobile Association (hereinafter USAA) is that the order violates the attorney-client privilege.

On July 20, 1968, a car driven by Mrs. Joan Pope, owned by respondent Harley Werley, and in which Mr. Werley and Mrs. Townsend were passengers, was involved in a collision with a vehicle driven by Jimmie Joe Carlisle. Townsend died in the accident, and Carlisle was convicted of negligent homicide on July 7, 1969, with the judgment of conviction being entered on September 4, 1969. Carlisle was uninsured, but all three occupants of the vehicle owned by Werley were insured under policies issued by petitioner USAA. USAA paid Werley the $15,000 limit due him under the uninsured motorist clause in his policy, but denied Werley's contention that he should be allowed to recover an additional $30,000 under the same clause in two policies issued by USAA to Tom and Joan Pope.

In April of 1970, Werley filed suit against USAA, seeking a declaratory judgment on his right to recover for his injuries up to the full limits of both Pope policies as well as his own policy. This court, in an opinion handed down in June of 1972, followed the *Lamb-Weston* doctrine and approved the practice of "stacking policies." [1]

Following this court's interpretation of the "other insurance" clause in Werley's

---

1. Werley v. United Services Auto. Ass'n, 438 P.2d 112 (Alaska 1972).

policy, in August, 1972, Werley filed an amended complaint seeking an additional $30,000 from USAA for personal injuries resulting from the collision with Carlisle. In response to Werley's amended complaint, USAA contested its liability under the uninsured motorist clauses. USAA contended that there was an issue of fact concerning Carlisle's negligence in that there was no showing that the time for Carlisle's appeal of his conviction of negligent homicide had elapsed. USAA also argued that there was the possibility that someone other than Carlisle might have carried insurance on Carlisle's vehicle, and that this possibility was a defense to any payment under the uninsured motorist clause.

Three months later, on November 27, 1972, USAA filed an interpleader action, positing the possibility of a claim by Joan Pope for damages resulting from the 1968 accident after the limits of the two Pope policies had been exhausted by Werley's claim and Townsend's husband's claim for damages based on his wife's wrongful death. In this interpleader action, which was subsequently consolidated with the Werley and Townsend actions, USAA explicitly denied that Werley was entitled to recover under the uninsured motorist clauses in the Pope policies. USAA simply argued that, in the event it was held liable to Werley, all the possibly interested claimants should be present to shield the insurer from double liability.

In response to the interpleader action brought by USAA, Werley filed a counterclaim which alleged that USAA had breached its duty to deal with its insured fairly and in good faith by refusing, without proper cause, to compensate him for a loss covered by his policy of insurance. Werley went on to allege that this breach of good faith was intended to coerce him into accepting less than the full amount to which he was entitled under his policy.

Subsequently, the interpleader action was rendered moot by the submission of affidavits signed by the Popes which released USAA from any obligation to compensate them as a result of the 1968 accident if the policy amounts were paid to Werley and Townsend. The Townsend claim was then settled, and shortly thereafter Werley's motion for a summary judgment was granted by the superior court,[2] leaving unresolved only Werley's counterclaim against USAA for its alleged bad faith failure to pay a valid claim of its insured.

During discovery regarding his counterclaim against USAA, Werley sought the production of the following documents:

(1) Any letters, correspondence, reports, communications and copies of the same, including notes of oral and telephone conversations, concerning the case of Werley v. United Services Automobile Association, Superior Court No. 70–1203,[3] sent or exchanged between and among USAA and any of its agents and legal counsel.

(2) All daily time sheets filled out by USAA's officers, agents or servants and their attorneys in the above designated action.

(3) All interoffice memoranda exchanged between and among the attorneys representing USAA in the action.

2. By the terms of this summary judgment, Werley was awarded $30,000 together with prejudgment interest of $8,270.13, costs of $521, and attorney's fees of $5000, for an aggregate judgment of $43,791.13. This judgment has been fully paid by USAA.

3. The Superior Court number utilized in the motion and subsequent order to produce apparently refers to both phases of Werley's suit against USAA: The first phase was the declaratory judgment action in which this court held that a "stacking" of benefits under the uninsured motorist clauses in the two Pope policies and Werley's own policy was permissible, and the second phase was Werley's amended complaint for personal injuries and USAA's defenses thereto which followed this court's mandate.

Petitioner USAA suggests in its brief to this court that the case number reference is only to the personal injury suit. Respondent Werley, on the other hand, interprets the reference as also relating to "the declaratory judgment action and the negotiations relating thereto."

Counsel for USAA initially resisted the motion to produce on the grounds that the documents were irrelevant, that they constituted an attorney's work product, and that they were confidential by virtue of the attorney-client privilege. USAA subsequently confined its resistance to the ground that any requested information not disclosed was protected by the attorney-client privilege.[4] Werley then moved to compel petitioner USAA to produce all the requested documents, and the superior court granted this motion. USAA received a stay of the production order so that it could petition this court seeking review of superior court's order. We have decided to grant this petition for review of the superior court's production order.[5]

The sole substantive issue requiring determination is whether the documents which are subject to the superior court's production order are protected by the attorney-client privilege. An appropriate point of departure is Alaska's discovery rules.

Civil Rule 34(a) provides in part:

Any party may serve on any other party a request (1) to produce . . . *any designated documents . . . which constitute or contain matters within the scope of Rule 26(b)* and which are in the possession, custody or control of the party upon whom the request is served . . . . (emphasis added).

Turning next to Civil Rule 26(b), that rule provides in part:

Parties may obtain discovery regarding *any matter, not privileged which is relevant* to the subject matter involved in the pending action . . . . (emphasis added).

This court has on numerous occasions expressed the view that Alaska's discovery rules should be given a liberal construction.[6] As expressed in Civil Rule 26(b), one of the limitations on discovery concerns matters that are privileged. Among the privileges recognized in Alaska is the attorney-client privilege. Civil Rule 43(h)(2) [7] provides as follows:

An attorney shall not, without the consent of his client, be examined as to any communication made by his client to him, nor as to the attorney's advice given thereon, in the course of the attorney's professional employment.

■■ The purpose of the attorney-client privilege is to promote the freedom of consultation of legal advisors by clients by removing the apprehension of compelled disclosure by the legal advisors.[8] Given our commitment to liberal pre-trial discovery, it follows that the scope of the attorney-client privilege should be strictly construed in accordance with its purpose.[9]

■ One of the widely recognized exceptions to utilization of the attorney-client privilege is that the privilege cannot be used to protect a client in the perpetration of a crime or other evil enterprise in concert with the attorney.[10] Wigmore notes that this exception

4. This alteration of strategy was the result of a change in counsel representing USAA.

5. *See* App.R. 23(d) and (e) and App.R. 24(a).

6. *See, e. g.*, State v. Leach, 516 P.2d 1383 (Alaska 1973); Hart v. Wolff, 489 P.2d 114, 117 (Alaska 1971); Mathis v. Hilderbrand, 416 P.2d 8 (Alaska 1966); Miller v. Harpster, 392 P.2d 21 (Alaska 1964).

7. Civ.R. 43 relates to evidence admissible at trial, but it is generally thought that the scope of the attorney-client privilege is the same at the discovery stage as at the trial stage. *See, e. g.*, 4 J. Moore, Federal Practice ¶ 26.60 [2] (1974); 8 C. Wright & A.

Miller, Federal Practice and Procedure: Civil § 2017 (1970).

8. *See* J. Wigmore, Evidence § 2291, at 545 (McNaughton rev. 1961); C. McCormick, Evidence § 87, at 175–76 (2d ed. 1972).

9. *See* Paper Converting Machine Co. v. FMC Corp., 215 F.Supp. 249 (E.D.Wis.1963); United States v. United Shoe Machinery Corp., 89 F.Supp. 357 (D.Mass.1950); Greyhound Corp. v. Superior Court, 56 Cal.2d 355, 15 Cal.Rptr. 90, 364 P.2d 266 (1961); Brunner v. Superior Court, 51 Cal.2d 616, 335 P.2d 484 (1959).

10. *See, e. g.*, United States v. Aldridge, 484 F.2d 655 (7th Cir. 1973) (securities and mail

is for the logically sufficient reason that no such enterprise falls within the just scope of the relation between legal advisor and client.[11]

Wigmore concludes that the communications between advisor and client must pertain to ongoing or future, rather than prior, wrongdoing before the privilege ceases to operate. In addition, the advice sought must be for a knowingly unlawful end, and there is generally a restriction of the exception to cases involving a crime or civil fraud.[12]

The mere allegation of a crime or civil fraud will generally not suffice to defeat the attorney-client privilege. In Clark v. United States[13] Justice Cardozo

> A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. . . . There are early cases apparently to the effect that a mere charge of illegality, not supported by any evidence, will set the confidences free. . . . But this conception of the privilege is without support in later rulings. . . . To drive the privilege away, there must be "something to give colour to the charge"; there must be "prima facie evidence that it has some foundation in fact."[14] (citations omitted)

The general rule is that there must be a prima facie showing[15] of fraud before the attorney-client privilege is deemed defeated.[16] We think the requirement of prima facie evidence of fraud as opposed to a mere allegation of fraud seems particularly meritorious in the circumstance where a party is seeking to discover all the attorney-client communications relating to the defense of an insurance claim by an insurer. Once a litigant has presented prima facie evidence of the perpetration of a fraud or crime in the attorney-client relationship, the other party may not then claim the privilege as a bar to the discov-

fraud); United States v. Rosenstein, 474 F. 2d 705 (2d Cir. 1973) (tax evasion); Grummons v. Zollinger, 240 F.Supp. 63 (N.D.Ind. 1964), aff'd, 341 F.2d 464 (7th Cir. 1965) (collusive action by an insurer); SEC v. Harrison, 80 F.Supp. 226 (D.D.C.1948) (securities fraud); Agnew v. Superior Court, 156 Cal.App.2d 838, 320 P.2d 158 (1958) (fraudulent pleadings); Fidelity-Phenix Fire Ins. Co. v. Hamilton, 340 S.W.2d 218 (Ky.1960) (fraudulent insurance claim); Eagle Indus. Assoc., Inc. v. Universal Oil Corp., 277 So. 2d 720 (La.App.1973) (conspiracy to fraudulently obtain a default judgment).

See in particular Judge Wyzanski's opinion in United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358–359 (D. Mass.1950).

11. J. Wigmore, Evidence § 2298, at 572 (McNaughton rev. 1961).

12. There is a division of opinion in the cases as to whether the term "civil fraud" or "tort" should be used to define the parameters of the exception to the attorney-client privilege. See Annot., 2 A.L.R.3d 861 (1965).

In the case at bar it is unnecessary for us to choose between the two terms for we find the alleged conduct of the petitioner to be both "fraudulent" and "tortious". Our subsequent discussion will utilize the "fraudulent" terminology, but this choice of language should not be interpreted as indicating an in-

tention to regard communications as to tortious non-fraudulent conduct as protected by the attorney-client privilege. Such a decision must await an appropriate future case. See also In re Callan, 122 N.J.Super. 479, 300 A.2d 868 (1973), where the court discusses the scope of the fraud exception to the attorney-client privilege.

13. 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1932).

14. Id. at 15, 53 S.Ct. at 469, 77 L.Ed. at 1000.

15. A prima facie case is one in which the evidence in one's favor is sufficiently strong for his opponent to be called on to answer it. This definition can be rephrased as requiring that the evidence in favor of a proposition be sufficient to support a finding in its favor, if all the evidence to the contrary be disregarded.

16. Accord, SEC v. Harrison, 80 F.Supp. 226 (D.D.C.1948); Nowell v. Superior Court, 223 Cal.App.2d 652, 36 Cal.Rptr. 21 (1963); Uniform Rules of Evidence, 26(2)(a) in 9A Uniform Laws Annotated 613 (1965); Jones on Evidence § 21:18 (6th ed. 1972).

But see Proposed Rules of Evidence, 46 F.R.D. 161, 251–56 (1969); C. McCormick, Evidence § 96, at 200 n. 52 and accompanying text (2d ed. 1972).

ery of relevant communications and documents.

█ Thus the controlling question in the case at bar is whether Werley has brought his claim for relief, as pleaded in his counterclaim, within the "civil fraud" exception to the attorney-client privilege. In accord with our previous discussion Werley must satisfy two requirements: (1) there must be an allegation of a continuing or future "civil fraud", and (2) he must produce prima facie evidence in support of this allegation.

The tortious activity alleged by Werley is that his insurer, USAA, breached its duty of good faith and fair dealing with him by refusing, without proper cause, to compensate him for a loss covered by his insurance policy. It is asserted that this tortious conduct took the form of USAA offering bad faith defenses to the legitimate claim of its insured, Werley.

In Richardson v. Employers Liability Assurance Corp.,[17] a California court recognized that every insurance policy has an implied-in-law covenant of good faith and fair dealing. The court held that:

Employers [the insurer] deliberately, willfully and in bad faith withheld payment of the Richardson claim months after it knew the claim to be completely valid; it forced an arbitration hearing on a claim against which it already knew that it had no defense; even after the award was made, it instructed its local office to attempt "to make the best possible settlement," and forced plaintiffs to resort to litigation to have the award judicially confirmed. This conduct toward its own insured was unconscionable, and constituted a tortious breach of contract.[18]

In our view the tortious conduct described in Richardson satisfies the definition of a "civil fraud", particularly when the breach of the implied covenant is manifested by a bad faith legal defense to a legitimate claim by one's insured. When an insurer through its attorney engages in a bad faith attempt to defeat, or at least reduce, the rightful claim of its insured, invocation of the attorney-client privilege for communications pertaining to such bad faith dealing 'seems clearly inappropriate.[19] We thus find that the tortious activity alleged by Werley satisfies the "civil fraud" requirement of the exception to the attorney-client privilege.

The next task for this court is to determine whether Werley has presented prima facie evidence of USAA's bad faith refusal to pay the legitimate claim of its insured. Werley's prima facie evidence of fraudulent conduct consists of a demonstration that the defenses urged by USAA in opposition to his claim for $30,000 were, on their face, devoid of any merit. Werley is obliged to present evidence that each defense urged by USAA was in bad faith. If one of the defenses to Werley's claim against USAA is not shown by prima facie evidence to have been a bad faith legal defense, then USAA's refusal to pay Werley's claim would not have been in bad faith, and USAA should prevail in its attempt to vacate the superior court's production order on the ground of attorney-client privilege.[20]

17. 25 Cal.App.3d 232, 102 Cal.Rptr. 547 (1972).

18. *Id.* at 552. *See also* Gruenberg v. Aetna Ins. Co., 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973); Fletcher v. Western Nat'l Life Ins. Co., 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970); *accord*, Crenshaw v. Great Cent. Ins. Co., 482 F.2d 1255 (8th Cir. 1973); Key Life Ins. Co. v. Mitchell, 129 Ga.App. 192, 198 S.E.2d 919 (1973); Norfolk and Dedham Mut. Fire Ins. Co. v. Cumbaa, 128 Ga.App. 196, 196 S.E.2d 167

(1973); Matthews v. Travelers Ins. Co., 212 Kan. 292, 510 P.2d 1315 (1973); Citizens Discount and Inv. Corp. v. Dixon, 499 S.W. 2d 231 (Mo.App.1973).

19. *See generally* Gebhardt v. United Rys. Co., 220 S.W. 677 (Mo.1920); Standard Fire Ins. Co. v. Smithhart, 183 Ky. 679, 211 S.W. 441 (1919).

20. *See* Crenshaw v. Great Cent. Ins. Co., 482 F.2d 1255 (8th Cir. 1973); Norfolk and Dedham Mut. Fire Ins. Co. v. Cumbaa, 128 Ga.App. 196, 196 S.E.2d 167 (1973).

On August 18, 1972, Werley filed an amended complaint against USAA, seeking to collect $30,000 by "stacking" the benefits available under the uninsured motorist clauses in the two Pope insurance policies. As mentioned previously this "stacking" had been specifically approved in a declaratory judgment rendered by this court in June of 1972. On August 25, 1972, USAA filed its answer to Werley's claim for relief asserting two affirmative separate defenses.

The first defense offered by USAA in its answer to Werley's amended complaint was that since Werley had not demonstrated that the time for appeal had elapsed in regard to Carlisle's criminal negligence conviction, the issues of Carlisle's negligence and the proximate cause of Werley's injuries were still "open" issues.[21] The lack of a good faith legal defense in this regard is shown by the following: First, in July of 1970 USAA had filed an answer to Werley's declaratory judgment complaint in which USAA acknowledged that it had already paid Werley $15,000 under the uninsured motorist clause in his policy. It is unlikely that this payment would have been made if USAA thought there was a legitimate basis for believing that Carlisle was either not negligent or that his negligence was not a proximate cause of Werley's injuries. Secondly, over three years had passed since Carlisle's conviction for negligent homicide in connection with the accident. The time for taking an appeal in Alaska from a criminal conviction is 30 days.[22] USAA at no time presented any evidence that in fact an appeal had been taken by Carlisle from his conviction.

Thus the suggestion in USAA's answer of the mere possibility that an appeal might still be pending at this late date appears to be of the character of contrived speculation. Finally, we note with regard to this first proffered defense that evidence of Carlisle's negligence was not limited solely to Carlisle's conviction of negligent homicide, but included the testimony of an eyewitness to the accident.[23]

The second defense offered by USAA on August 25 was that it had not been demonstrated that Carlisle was uninsured. USAA in fact asserted the possibility that someone other than Carlisle had taken out insurance on Carlisle's vehicle prior to the accident without Carlisle knowing of this insurance.[24] This defense seems reflective of a greater degree of bad faith then the preceding one. USAA admitted as early as July of 1970 that it had paid $15,000 to Werley under the uninsured motorist clause in his policy. If USAA had some basis for believing that Carlisle's vehicle was insured, it surely would have been reasonable for it to have investigated this issue before making the initial payment. Again, USAA presented no evidence to indicate that it had some factual basis for believing that Carlisle's vehicle was insured; all the evidence in the case pointed toward the fact that the vehicle was uninsured.

On March 1, 1973, Werley was granted a summary judgment against USAA for $30,000 plus interest, costs and attorney's fees. At the time summary judgment was granted, USAA had apparently presented no evidence to support either of its defenses although it was still urging both defenses and opposing entry of summary judgment.[25]

21. Counsel for USAA reiterated this contention in a November 22, 1972, memorandum filed in opposition to Werley's motion for summary judgment and in answers to requests for admissions which were signed by counsel for USAA in November of 1972.

22. Crim.R. 32.1.

23. An affidavit of the testimony of this eyewitness to the original accident was submitted by Werley when he made his October 26, 1972, motion for summary judgment. Wer-

ley further relied on the evidence adduced at Carlisle's criminal trial.

24. Counsel for USAA repeated this assertion in a November 22, 1972, memorandum which was filed by USAA in opposition to Werley's motion for summary judgment. In November, 1972, answers to requests for admissions, which were signed by counsel for USAA, it was denied that Carlisle's vehicle was uninsured.

25. USAA's opposition to Werley's motion for summary judgment attempted to advance

In light of both the speculative nature of the two defenses urged by USAA and the total lack of evidence presented by USAA to support these defenses, we conclude that Werley has adequately satisfied the requirement that prima facie evidence be presented that USAA's refusal to pay the claim of its insured was in bad faith and breached the implied covenant of good faith and fair dealing with its insured.[26]

█ USAA offers the argument that it was justified in withholding payment of Werley's claim for $30,000 under the uninsured motorist clauses in the two Pope policies until the Popes could be interpleaded into the action. On November 27, 1972, three months after USAA had entered the two defenses outlined above, USAA filed an interpleader complaint in superior court.[27] Alleging the possibility that the Popes, after the limits of their policies had been paid to Werley and the Townsend estate, might come into court and make a claim for payment under their policies for injuries suffered by Joan Pope, USAA sought to interplead the Popes, Werley, and the Townsend estate into a single action. In this interpleader complaint USAA sought first a declaration that none of the defendants were entitled to recover under the uninsured motorist clauses,[28] but that if

the insurer were liable, the insurer's liability should be limited to $60,000 and the Popes, Werley, and the estate of Townsend should decide among themselves how that amount was to be divided.

The day after this interpleader action was filed, it was consolidated with the Werley and Townsend suits. On December 21, 1972, both Tom and Joan Pope signed documents releasing USAA from any liability to them if it made the payments under the Pope policies to Werley and the Townsend estate. Following the signing of these releases, USAA sought to have the superior court enter judgment, awarding $30,000 each to Werley and the Townsend estate and dismissing all further claims against USAA. Werley opposed this motion, arguing that the insurer was seeking to escape liability for prejudgment interest, attorney's fees, and court costs as well as for damages on Werley's counterclaim alleging breach of the implied covenant of good faith dealing between insurer and insured.

Memoranda submitted by USAA to the superior court after the signing of the releases by the Popes (and thus the mooting of the interpleader issue) made it clear that USAA had not abandoned its original position that it had valid defenses to Wer-

---

the two defenses we have mentioned without any semblance of compliance with the requirements of Civil Rule 56(c) and (e).

26. *Cf.* Key Life Ins. Co. v. Mitchell, 129 Ga.App. 192, 198 S.E.2d 919 (1973).

In finding that Werley has presented prima facie evidence of the bad faith nature of these two defenses, we are of course not expressing any opinion or judgment on whether in fact USAA is guilty of a breach of the implied covenant of dealing in good faith and fair dealing with its insured. This question is one that must be decided in the first instance by the superior court. Our conclusion is directed solely to the issue of whether Werley has satisfied the discovery prerequisite of demonstrating prima facie evidence of fraudulent activity in order to come within an exception to the attorney-client privilege.

27. Civ.R. 22 provides:

Persons having claims against the plaintiff may be joined as defendants and required

to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers that he is not liable in whole or in part to any or all of the claimants. A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim. The provisions of this rule supplement and do not in any way limit the joinder of parties permitted in Rule 20.

There is no explanation in the record as to why USAA filed the interpleader as a separate action.

28. Denial of liability to any or all claimants is specifically permitted by Civ.R. 22. *See* note 24 *supra*.

ley's claim under the Pope policies.[29] The motion for entry of judgment for Werley in the amount of $30,000 which was made by USAA was in fact a settlement offer, explicitly conditioned on a waiver by Werley of any right to court costs, prejudgment interest, attorney's fees, or damages on his counterclaim.

The tort alleged to exist by Werley in the case at bar was essentially complete when USAA refused payment of his claim and entered the two allegedly bad faith defenses on August 25, 1972. These defenses were never withdrawn by USAA; they were eventually rejected by the superior court when it granted Werley's motion for summary judgment on March 1, 1973. The interpleader complaint filed on November 27 did not concede liability to Werley. The complaint incorporated the two defenses that USAA had urged on August 25, adding the additional procedural tactic of interpleading all of the possible claimants under the Pope policies. When the interpleader was rendered moot by the releases signed by the Popes, USAA continued to maintain its two original defenses to Werley's personal injury claim. These defenses were urged up until the time that summary judgment was entered for Werley's claim under the uninsured motorist clauses in the Pope policies.[30]

It is our opinion that the interpleader must be viewed as strictly a procedural device. The interpleader was never a defense to the payment of Werley's claim under the Pope policies; it was simply a procedural device to bring all the possible claimants under the Pope policies into a single action. It is thus unnecessary for Werley to demonstrate by prima facie evidence that the interpleader was filed in bad faith; the good or bad faith of this procedural device does not affect the two substantive defenses of USAA which were urged as the reason for non-payment of benefits throughout this period.[31]

USAA urges this court to take into consideration the dire consequences that will result from a ruling opening attorney-client communications in this case. USAA argues that any litigant with a claim of disputed merit would be subject to examination of attorney-client communications by the other side. Thus, the argument continues, litigants would be hesitant to fully disclose all facts to counsel from whom advice was solicited and would be inhibited from asserting claims of doubtful merit.

We think USAA has overstated its argument. In order to compel disclosure of attorney-client communications in cases such as this, there is not only the requirement that one allege a bad faith refusal of an insurer to pay the valid claim of its insured, but also that a prima facie case of bad faith refusal be shown.

29. In a memorandum submitted to the superior court on January 10, 1973, counsel for petitioner USAA stated:

it is the defendant's [USAA] position that the plaintiff [Werley] is not entitled to summary judgment in this matter for any amount: but in the alternative, that the court should make a final determination in the interpleader action . . . wherein after awarding a $30,000 judgment to Harley D. Werley, it should hold that United Services Automobile Association owes no further duty to that individual either in that interpelader action or in this action.

30. In Gabler v. Minnesota Mut. Life Ins. Co., 498 S.W.2d 413 (Tex.Civ.App.1973), the court held that an insurance company confronted with arguably rival claimants to insurance policy proceeds need not act as judge and jury in dispensing the proceeds. The insurance company could file an interpleader, pay the money into court, and have the court decide who had the superior claim. But in Gabler the insurance company did not deny liability to the rival claimants, and it is the denial of liability before, during, and after the interpleader was filed that distinguishes the present case from Gabler.

31. While it is not necessary for us to decide whether prima facie evidence of the possible bad faith nature of the interpleader has been presented by Werley, the possible motivations of the interpleader might well be an area of fruitful inquiry in the superior court. A procedural device used solely for delay or bargaining leverage against one's insured would support the claim of breach of the implied covenant of fair dealing, whereas the good faith utilization of interpleader might tend to undercut such a claimed breach.

We therefore hold that the superior court's order of production should be affirmed.

ERWIN, J., not participating.