IN THE MATTER OF MICHAEL CALLAN, HARRIS DAVID AND GERARD CLARK, CHARGED WITH CONTEMPT OF COURT.

Argued October 21, 1974—Decided February 4, 1975.

*Mr. Dickinson R. Debevoise* argued the cause for appellants (*Ms. Annamay T. Sheppard,* of counsel and on the brief; *Messrs. Riker, Danzig, Scherer & Brown,* attorneys).

*Ms. Sara A. Friedman,* Assistant Prosecutor, argued the cause for respondent (*Mr. Francis John Badach* and *Mr. Ralph J. Jabbour,* Assistant Prosecutors, of counsel; Mr. *Joseph P. Lordi,* Essex County Prosecutor, attorney).

A brief was filed for *amicus curiae Stanley C. Van Ness,* Public Defender (*Mr. Robert Westreich,* Assistant Deputy Public Defender, of counsel and on the brief).

A brief was filed for *amici curiae* Commission on Law & Social Action of the New Jersey Region of American Jewish Congress; The National Conference of Black Lawyers; The National Legal Aid and Defenders Association; The New Jersey Legal Services Project Directors Association; The American Civil Liberties Union of New Jersey; The Student Bar Association, Rutgers University School of Law, Newark, New Jersey. (*Mr. Frank Askin,* attorney).

A brief was filed for *amici curiae* Joseph Barry, Murray Brochin, Sheldon Bross, Michael Griffinger, Joshua Levin, John McKay, Morton Stavis, Seymour Wishman, members of the New Jersey Bar (*Mr. Joseph Barry,* on the brief).

The opinion of the Court was delivered by

SULLIVAN, J.   Defendants-appellants were convicted of contempt of court arising out of their conduct in the course of a civil trial. *In re Callan,* 122 *N. J. Super.* 479 (Ch. Div. 1973). Their convictions were upheld by the Appellate Division, 126 *N. J. Super.* 103 (1973). This Court granted certification. 64 *N. J.* 503 (1974). The matter has the following background.

The Stella Wright Housing Project, operated by the Housing Authority of the City of Newark, had become the object of a tenants rent strike to protest intolerable living conditions in the Project. A Stella Wright Tenants Association was formed and rents withheld from the Housing Authority were turned over to representatives of the Tenants Association. In all, some $94,000 was received by the Association and was deposited in a bank. This money was later withdrawn, converted into money orders and then placed in a safe deposit box. The Housing Authority filed suit for the rent money and in the interim asked that the court order the Association and its representatives to turn the money over to a receiver for safekeeping. The Association and its representatives opposed the application by giving assurances in affidavit form that the funds were intact and secure.

The court did not order the money to be turned over to a receiver. Instead it ordered the Association to account for all moneys received, and directed that the funds in hand were to be retained in the then depository and not withdrawn or removed except by order of the court, pending a court determination as to the rights of the Housing Authority and the contributing tenants respectively in the funds.

Appellants-attorneys were representing the Tenants Association at this point and participated in the several court hearings involving custody of the money.

On October 12, 1972 the trial judge made a determination based on *Marini v. Ireland,* 56 *N. J.* 130 (1970), that the tenants were not entitled to rent free occupancy in the Project because of the living conditions, and that at most they would be entitled to an abatement of rent. All tenants who had paid rent money into the fund were ordered on November 6, 1972 to show cause why the fund should not be turned over to the Housing Authority, subject to the tenants establishing the basis for any claimed refund. The order was returnable on November 17, 1972.

When word of the court's proposed action was received, a meeting of the executive committee of the Association was held on November 13, 1972. Possible refund of the rent money to the contributing tenants was discussed. Appellants who were present at a part of the meeting counseled strongly against disbursement of the funds, said it would be a violation of the court order and would subject those responsible to charges of contempt. They advised that if the court ordered the money turned over to the Housing Authority, the tenants could appeal and still have a chance to retain possession of the funds. The executive committee then decided to hold a meeting of all of the contributing tenants the next day to decide what to do with the money.

On the morning of November 14, 1972 the funds were taken from the safe deposit box to be available for distribution if the tenants so decided. Appellants were unaware of this action, nor did they attend the November 14, 1972 meeting. However, they knew the meeting was going to take place and what its purpose was.

At the November 14, 1972 meeting the unanimous decision was to refund the rent payments to the contributing tenants. A large portion of the moneys was returned to the tenants that same day.

Appellants had requested that they be told before November 17 whether or not their advice was going to be followed so that a charade would not be made of the court hearing on that day. Accordingly, on the evening of November 15 appellant Callan was notified of the decision and was told the reasons why the moneys were returned.

Apparently,[2] Callan communicated this information to the other attorneys and a written statement was prepared for presentation in court on November 17.

When the matter was called in open court on the 17th, after counsel for the Housing Authority had begun to speak, appellant Callan interrupted him and read the prepared statement in which it was disclosed to the court and to counsel for the Housing Authority for the first time that the funds had been withdrawn from the depository "to redistribute to the various tenants the full amount of deposits payed by such tenants to the fund."[3]

In response to the statement, the trial court noted its embarrassment over what had occurred and in effect said that its trust in those who had been made responsible for the safe-keeping of the fund had been misplaced. The court urged counsel for the Association to advise their clients to correct the situation which they had brought about. The hearing was thereupon closed.

Charges of contempt were thereafter preferred against appellants and a plenary hearing held. Appellants elected not to testify at the hearing. The trial court found appellants guilty of contempt basically holding that their remaining silent until the morning of the hearing, after they learned

---

[2]We say apparently because, regrettably, appellants chose not to testify at the contempt hearing and we can only infer as to what they did after they learned what had happened.

[3]While the statement speaks in terms of "to redistribute" it would appear that by this time all or substantially all of the money had already been refunded since appellants' endeavors, begun that same day at the suggestion of the court, were directed towards gathering the money back together again.

that the funds had been withdrawn and were in the process of distribution, resulted in the court and counsel laboring under a misapprehension of the true facts and amounted to fraudulent and deceitful conduct on appellants' part.[4]

For reasons hereinafter stated, we conclude that appellants were not guilty of contempt and the charges against them must be dismissed.

Preliminarily, however, it seems clear that the embarrassing situation in which the trial court found itself at the hearing on November 17 could have been avoided had the court acted promptly at the very beginning of the litigation to safeguard the funds by ordering them turned over to a receiver pending its decision on the merits. By leaving the funds under the exclusive control of partisans and then rendering a decision in favor of the Housing Authority the court almost invited the result which followed.

Returning to the matter of appellants' silence, however poor their judgment in the course of conduct they followed, it did not constitute a contempt of court. They violated no order of the court. They had given no personal assurances as to the integrity and safety of the funds. When they learned that consideration was being given by the Association to possible withdrawal of the funds contrary to the court order, they advised strongly against the proposal and warned that those involved would be subject to contempt. They urged their clients to use the appeal process to vindicate their position and not take the law into their own hands. The foregoing, contrary to being contemptuous of the court's authority, dignity and the administration of justice, sought to uphold the rule of law and the authority of the court.

It has been suggested that appellants were under an obligation to inform the court as to the November 13 meeting of the executive committee which they attended, at which pos-

---

[4]The representatives of the Tenants Association who had participated in the violation of the court order were also charged with contempt and found guilty. They have not appealed their convictions.

sible disbursement of the funds was discussed. As far as the record we have shows, no decision to violate the court order was reached at that meeting and appellants advised strongly against any such course of conduct.

It is impossible to determine from the sparse record of that meeting whether distribution of the funds became a foregone conclusion subject only to approval by the general membership of the association on the following day. If appellants possessed such knowledge, we think they would have been required to inform the court that its order as to the security of the funds was about to be violated. The attorney-client relationship would not require or justify silence in a situation where the integrity of the rule of law was at stake. The record is inadequate in this area. We simply do not know what knowledge appellants possessed.

However, when appellants were told on the evening of November 15 that the funds had been withdrawn and were being refunded to the tenants, they should have notified the court immediately. This information was given to them at their request manifestly so that it might be communicated to the court in advance. For reasons of their own appellants chose not to notify the court of what had happened until the court hearing had commenced and the very charade which they had professed they wanted to avoid, became a reality.

It may well be that little or no money would have been salvaged had appellants made an immediate disclosure to the court. At the least, though, it would have avoided the unfortunate confrontation which took place in court on November 17, and the resultant embarrassment to the process of law. Prompt disclosure would also have vindicated the obligation of responsibility and professionalism which all attorneys owe to the court.

We do not doubt that appellants were sincere and well intentioned in their actions. We conclude, however, that they used extremely poor judgment in the circumstances, even though we find their conduct to be not contemptuous.

We make no decision at this time as to whether appellants conduct as attorneys was at least unethical or unprofessional and in violation of *Disciplinary Rules of the Code of Professional Responsibility.* See *R.* 1:14. The matter is presently before the Essex County Ethics Committee but hearing was stayed by order of this Court pending the outcome of the instant appeal. We hereby vacate the aforesaid stay so that the matter can proceed in due course before the Committee.

Reversed.

MOUNTAIN, J. (concurring). This case presents an interesting and difficult question which has never been precisely answered. Clearly a lawyer owes a duty of loyalty to his client and equally clearly he owes a duty of loyalty to the court. How, when these duties come into conflict, shall the resulting dilemma be resolved? How shall the obligations be reconciled?

The problem originates in our adversary system of administering justice. To this system we are committed by centuries of tradition and usage. As Justice Jackson once said, "A common law trial is and always should be an adversary proceeding." *Hickman v. Taylor,* 329 *U. S.* 495, 516, 67 *S. Ct.* 385, 396, 91 *L. Ed.* 451, 465 (1947). "If there is any message that I can leave with a younger trial lawyer, this is the one I yearn most to impart: the trial of a lawsuit is an adversary business."[1]

The success or failure of an adversary system of meting out justice depends in very large part upon the devotion, dedication, tenacity and competence of the lawyers involved. In some substantial degree the effectiveness of the representation an attorney affords his client will depend upon the quality of the relationship that exists between them. And only if that relationship is one of utter trust and confidence

---

[1] Lon Hocker, Esq., of the St. Louis Bar, during a panel discussion on "Trial Tactics," American Bar Association (Chicago, 1951), quoted in *Curtis, It's Your Law* (1954) 2.

on the part of the client will he communicate with his attorney in a completely candid and uninhibited manner. Of perhaps paramount importance in inducing this kind of relationship and trust is a conviction on the part of the client that his communications to his attorney will not be revealed to others. It would be difficult to exaggerate the importance of this factor.

Of course it goes without saying that a client's communications to his lawyer are to be treated as confidential unless the client agrees otherwise. There are exceptions to this rule, born of sound policy, yet they are few and thus far carefully circumscribed. If a client reveals to his lawyer that he, the client, is about to commit a crime, the privilege of confidentiality certainly does not pertain. This is the clearest, and some will say the only, exception to the rule.

> Suppose, however, he [your client] tells you that he is going to burn down the courthouse or that he is going to commit another murder that afternoon. Now what is your duty? It is obvious. Your duty to the community rises above your duty to your client. [*Roberts, Owen J., The Lawyer's Duties to his Clients,* 7 *Univ. of Fla. L. Rev.* 413, 418 (1954)]

I think there may be other occasions when the privilege gives way. A client should not, for instance, be allowed, with his attorney's knowledge, to perpetrate a blatant fraud upon the court. What occurred in this case, let me quickly add, was in no way a fraud. The appellants' clients deliberately violated a court order, but no fraud was committed.

I have suggested that the issue posed by the clash of these conflicting loyalties has never been definitively resolved. The point of view that would, in such a situation, generally tip the scales in favor of the client is persuasively expounded by Charles P. Curtis in his book, "It's Your Law," *supra,* 1–41[2] and in his article, *The Ethics of Ad-*

---

[2]Reprinted with only minor change in *Voices in Court,* (Davenport ed. 1958), 2–25.

*vocacy,* 4 *Stan. L. Rev.* 3 (1951). The opposing view is ably stated by Henry S. Drinker in *Some Remarks on Mr. Curtis' "The Ethics of Advocacy,"* 4 *Stan. L. Rev.* 349 (1952). An examination of these materials will clearly indicate the difficulty of the problem.

In this case the majority have agreed to set aside the judgment of conviction of contempt that was entered below, a decision with which I am in complete accord. They have, however, reached the conclusion that appellants used bad judgment in not notifying the court sooner than they did that an order of the court was being impugned, and that this failure on the part of appellants was a violation of their duty of loyalty to the court. I would, myself, go further along the road of exculpation. As Mr. Curtis has observed,

The lawyer's official duty, required of him indeed by the court, is to devote himself to the client. He has two masters, and it is sometimes hard to say which comes first. There are occasions when our system of justice seems to give the nod to the client. [*It's Your Law, supra,* at 6]

In my opinion this is such a case. I cannot bring myself to criticize what appellants did and I doubt that I could withhold criticism had they acted otherwise.

Since the argument of this case the Supreme Court has decided *Maness v. Meyers,* —— *U. S.* ——, 95 *S. Ct.* 584, 42 *L. Ed.* 574 (1975). There an attorney at law of the State of Texas had been held in contempt of court for advising his client that the latter might properly, in his own interest, refuse to obey a court order. The order required the client to bring to court and submit to inspection certain documents, the revelation of which might well have resulted in criminal proceedings being brought against him. Pursuant to his attorney's advice, and, as he said, for no other reason, the client refused to comply with the order of the court. The attorney rested his advice upon the proposition that compliance with the order might have the feared result and that hence his client's right under the Fifth Amend-

ment to refrain from incriminating himself constituted adequate justification to disobey the order. The attorney was held in contempt of court and was accorded no relief while exhausting his state court remedies. The Supreme Court unanimously reversed and set aside the conviction. It concluded that the course followed by the attorney had been entirely proper.

I do not suggest that this decision is controlling here. It is not. Essentially it is another manifestation of the zeal with which the Supreme Court intends to support the Fifth Amendment. The opinions of the Court, however, do impart to the reader a deep-seated conviction that where the loyalties we are considering come in conflict there are indeed "occasions when our system of justice seems to give the nod to the client."

I concur in the conclusion of the Court that the conviction of contempt be set aside. I further state that in my opinion the conduct of appellants was in no respect improper.

Justices PASHMAN and CLIFFORD join in this concurring opinion.

MOUNTAIN, PASHMAN and CLIFFORD, JJ., concur in the result.

*For reversal*—Chief Justice HUGHES and Justices JACOBS, HALL, MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD—7.

*For affirmance*—None.