**CENTRAL CONSTRUCTION COMPANY, Manson Construction & Engineering Company, Osberg Construction Company and Ghemm Company, Inc., a joint venture, Petitioners,**

v.

**The HOME INDEMNITY COMPANY, Respondent.**

No. S–3486.

Supreme Court of Alaska.

June 8, 1990.

Rehearing Granted and Opinion Amended July 2, 1990.

Michael C. Geraghty, Staley, DeLisio, Cook & Sherry, Inc., Anchorage, R. Jack Stephenson and Ian Rodihan, *pro hac vice*, Seattle, Wash., for petitioners.

Robert J. Dickson and Jerome H. Juday, Atkinson, Conway & Gagnon, Anchorage, for respondent.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

This petition arises out of a dispute between The Home Indemnity Company (Home) and CMOG[1] over the handling of an insurance claim. CMOG sought discovery of certain documents from Home in connection with CMOG's counterclaim. Home refused to fully comply with CMOG's discovery request, asserting that the documents fall within the attorney-client privilege.

The superior court denied CMOG's motion to compel discovery. It held that CMOG must make a *prima facie* showing that Home committed civil fraud before CMOG could overcome Home's claim of privilege.

CMOG petitioned for review, Appellate Rule 402(a), arguing that (1) a *prima facie* showing of every element of civil fraud is

unnecessary under the relevant law to overcome Home's claim of privilege, and (2) at the least, the superior court should have conducted an *in camera* hearing to determine the propriety of Home's claim of privilege.

We granted the petition, Appellate Rule 402(b), and reverse the decision of the superior court.

## I. STATEMENT OF THE CASE

In 1977 two workers, Robert Moloso and his son Joseph, were killed by a rockslide on a state highway construction project in Valdez. The Molosos' estates filed suit against the state alleging various theories for recovery. The state tendered the defense of the claim to its contractual indemnitor, CMOG, which in turn tendered the defense of the claim to Home. CMOG had a $1 million primary coverage policy with Home and a $3 million dollar excess coverage policy with the Mission Insurance Group (Mission).

Following trials, appeals and reversals in *Moloso v. State*, 644 P.2d 205 (Alaska 1982) (Moloso I) and *Moloso v. State*, 693 P.2d 836 (Alaska 1985) (Moloso II), the Moloso estates prevailed, obtaining a judgment eventually satisfied for $2.3 million. Prior to the Moloso estates obtaining the settlement money, however, Mission became insolvent and was unable to pay any part of the judgment. Home paid the entire judgment in response to demands from the Moloso estates and the state.

Home filed suit against the state and CMOG, among others, claiming that there was no coverage under the policy and therefore it should be reimbursed its entire loss. Alternatively, Home sought reimbursement of the amount it paid in excess of $1 million, in addition to subrogation claims against other parties Home considered to be liable.

In response to Home's suit, CMOG asserted that Home was acting in bad faith

---

1. CMOG is a joint venture comprised of Central Construction Co., Manson Construction & Engineering Co., Osberg Construction Co., and GHEMM Construction Co. There is some question as to whether Ferrante Construction Co. is a member of this joint venture. The issue, however, is not material for purposes of this appeal.

by denying coverage. To support this assertion, CMOG sought discovery of Home's entire claims file. Included in Home's response to the discovery request was an appendix identifying documents withheld on the basis of attorney-client or work product privileges. CMOG filed a motion to compel discovery or, at the least, to have the court or a special master conduct an *in camera* inspection of the documents to determine the propriety of the privileges claimed. Home opposed this motion.

A special master was appointed who, after extensive briefing and a hearing, issued a recommendation that CMOG's motion to compel be denied. The master found that: (1) CMOG's unsupported contention that Home's privilege claims may be invalid is not sufficient to require an *in camera* review of the documents; (2) Home has the right to prepare for and maintain a coverage action against CMOG and the assertion of privileges is therefore fully available to Home; (3) because there is an adversarial relationship with respect to the coverage issue, the "joint client" exception to privilege assertions is not applicable; (4) *United Serv. Auto. Ass'n v. Werley*, 526 P.2d 28 (Alaska 1974), which explicitly left open the question whether the "crime or tort" or "crime or fraud" parameters of the exception to the attorney-client privilege is applicable in Alaska, *id.* at 32 n. 12, is no longer relevant because Alaska Evidence Rule 503(d)(1)[2] adopted the narrower "crime or fraud" exception; (5) because CMOG did not plead or allege fraud, CMOG's motion to compel should be denied without prejudice; (6) even if CMOG were allowed to amend its pleadings, it failed to meet its burden of proving a *prima facie* case of fraud against Home; and (7) CMOG's briefing of the work product exception was insufficient as it did not show that CMOG is "unable without undue hardship to obtain the substantial equivalent of the materials by other means" as required by Alaska Civil Rule 26(b)(3).

The superior court adopted the analysis and recommendation of the special master. Additionally, the superior court granted Home a protective order and directed CMOG to amend its answer and counterclaim to include assertions of fraud. CMOG petitioned for review.

## II. DISCUSSION

Subsequent to our grant of CMOG's petition for review, the superior court granted CMOG's motion for summary judgment on other grounds, ruling that Home was estopped to deny coverage for the loss at issue. As a result of this ruling, the issue before us may be technically moot. Nevertheless, because of the recurring nature and importance of the issue, we address it. *See Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985) (mootness determination ultimately left to discretion of the court); *State v. Thompson*, 612 P.2d 1015, 1016 (Alaska 1980) (recurring nature of problem is valid justification for reviewing technically moot issue).

### A. SCOPE OF THE TERM "FRAUD" FOR PURPOSES OF THE CRIME OR FRAUD EXCEPTION TO THE ATTORNEY–CLIENT PRIVILEGE.

CMOG argues that the superior court erred in relying on the special master's conclusion that *Werley* is no longer good law. CMOG points out that *Munn v. Bristol Bay Hous. Auth.*, 777 P.2d 188 (Alaska 1989), reaffirmed the validity of *Werley*. *Id.* at 195.

Additionally, CMOG asserts that neither *Munn* nor *Werley* defined "civil fraud" in as stringent a manner as the superior court in this case. CMOG argues that "fraud," as the term is used in Alaska Evidence Rule 503(d)(1), is defined broadly. CMOG asserts that *Munn* supports the proposition that fraud includes situations where there is a "bad faith purpose" for a party's actions. *See id.* CMOG cites the Evidence Rules commentary in support of its view

---

**2.** Alaska Evidence Rule 503(d)(1) provides:

(d) There is no privilege under this rule:
(1) *Furtherance of Crime or Fraud.* If the services of the lawyer were sought, obtained or used to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud, ....

that the court should focus on Home's intentional or reckless disregard of CMOG's rights. The commentary to Alaska Rule of Evidence 503(d)(1) cites 8 J. Wigmore, Evidence § 2298 (J. McNaughton rev. 1961) for the proposition that the attorney-client privilege "does not extend to advice in aid of future wrongdoing."

CMOG is correct in its statement that neither *Munn* nor *Werley* defined "civil fraud" in as stringent a manner as the superior court or Home suggests. The adoption of Alaska Evidence Rule 503(d)(1) is not indicative of this court's intent to use a narrow "crime or fraud" standard.

■ We do not now, nor have we ever deemed it permissible for a client to use the attorney-client privilege to exclude from discovery "advice in aid of future wrongdoing." *See* Commentary to Alaska Rule of Evidence 503(d)(1); *see also* 8 J. Wigmore, Evidence § 2298 (J. McNaughton rev. 1961); *Munn*, 777 P.2d at 194; *Werley*, 526 P.2d at 32. Consequently, we decline to accept Home's argument that "crime or fraud" should be narrowly defined, and hold that services sought by a client from an attorney in aid of any crime or a *bad faith breach* of a duty are not protected by the attorney-client privilege. *See, e.g., Werley*, 526 P.2d at 33 ("[w]hen an insurer through its attorney engages in a bad faith attempt to defeat ... the rightful claim of its insured, invocation of the attorney-client privilege for communications pertaining to such bad faith dealing seems clearly inappropriate") (footnote omitted). "Acts constituting fraud are as broad and as varied as the human mind can invent. Deception and deceit in any form universally connote fraud. Public policy demands that the 'fraud' exception to the attorney-client privilege ... be given the broadest interpretation." *In re Callan*, 122 N.J.Super. 479, 300 A.2d 868, 877 (Ch.Div.1973), *aff'd*, 126 N.J.Super. 103, 312 A.2d 881 (App.Div. 1973), *rev'd on other grounds*, 66 N.J. 401, 331 A.2d 612 (1975) (interpreting New Jersey Evidence Rule 26 which is substantially equivalent to Alaska Evidence Rule 503(d)(1) ).

The policy of promoting the administration of justice would not be well served by permitting services sought in aid of misconduct to be cloaked in the attorney-client privilege. *See id.* at 878; *Fellerman v. Bradley*, 99 N.J. 493, 493 A.2d 1239, 1245 (1985). *See also* 8 J. Wigmore, Evidence § 2298 at 577 (J. McNaughton rev. 1961) (the attorney-client privilege should not "protect a deliberate plan to defy the law and oust another person of his rights, whatever the precise nature of those rights may be"); E. Cleary, McCormick on Evidence § 95 at 229 (3d ed. 1984) ("it would be a perversion of the privilege to extend it to the client who seeks advice to aid him in carrying out an illegal or fraudulent scheme").

## B. *IN CAMERA* REVIEW.

The next question is whether the "crime or fraud" showing must be made with evidence entirely independent of the communications at issue. In answering this question we must examine the role of *in camera* inspections in determining the validity of a claimed privilege.

A balance must be reached between allowing *in camera* review based on a party's unsupported assertions that the "crime or fraud" exception applies, and requiring a party to meet the same quantum of proof for *in camera* inspections as would ultimately be necessary to overcome the privilege. This balance is struck by requiring a lesser evidentiary showing for allowing *in camera* inspection than is required ultimately to overcome the privilege.

■ In *United States v. Zolin*, — U.S. —, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the Supreme Court was faced with much the same issue as that presented to us. The Supreme Court struck a balance between too much judicial inquiry, which "would force disclosure of the thing the privilege was meant to protect," and "a complete abandonment of judicial control [which] would lead to intolerable abuses." *Id.* 109 S.Ct. at 2630 *quoting United States v. Reynolds*, 345 U.S. 1, 8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953). The Court stated:

Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, "the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person," . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

*Id.* 109 S.Ct. at 2631 (citation omitted).

The Court further stated:

Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relevant importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply. The district court is also free to defer its *in camera* review if it concludes that additional evidence in support of the crime-fraud exception may be available that is *not* allegedly privileged, and that production of the additional evidence will not unduly disrupt or delay the proceedings.

*Id.*

■ We think the balance struck by the Supreme Court is a prudent one, and thus adopt it for use by our courts. Whether an *in camera* inspection is the proper method in this case to determine if CMOG can make a *prima facie* case of bad faith on Home's part is another question.

First, Home knew of the exclusion in the policy from the beginning.[3] Prior to deciding whether to accept the tender of defense, Home's own territorial supervisor stated that she "did not recognize any coverage defenses. . . ."

CMOG asserts that it "relaxed its vigil" once the tender was accepted by Home. CMOG states that it had no idea Home was considering a coverage defense until after *Moloso I*, at which time Home sent CMOG a reservation of rights letter.

Home justified the time lapse between accepting the tender and sending the reservation of rights letter by implying that it did not become aware of the possible applicability of exclusion (b) until August 12, 1982. CMOG, however, cites to the record to show that Home was considering the coverage issue prior to August 12, 1982. The record includes correspondence, dated June 29, 1982 through July 28, 1982, which discuss the coverage issue and concludes that a reservation of rights letter should be sent immediately.

CMOG promptly rejected Home's reservation of rights, a position with which Home's own claims manager agreed. Home never responded to CMOG's rejection.

It was at this point, CMOG asserts, that the conflict of interest began. CMOG asserts that it was deliberately kept in the dark about the litigation so that Home could exercise sole control over the process. If Home lost it would assert a coverage defense. CMOG argues that this fall-back position gave Home confidence that it need not accept a reasonable settlement because it could always assert a coverage defense. As a result, CMOG asserts that Home

---

**3.** The exclusion reads:
This insurance does not apply:

   .     .     .     .     .

(b)(1) if the insured is an architect, engineer or surveyor, to bodily injury or property damage arising out of professional services performed by such insured, including
   (i) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, and
   (ii) supervisory, inspection or engineering services;

(2) if the indemnitee of the insured is an architect, engineer or surveyor, to the liability of the indemnitee, his agents or employees, arising out of
   (i) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, or
   (ii) the giving of or the failure to give directions or instructions by the indemnitee, his agents or employees, provided such giving or failure to give is the primary cause of the bodily injury or property damage; . . .

"substantially understated the fair settlement value of the case," thus passing up opportunities for settlement and acting adversely to CMOG's interest. If true, this would, in our view, constitute a bad faith breach of Home's duty to defend the suit in the best interest of the insured.

Home contends that the fact that it waited so long to bring the coverage action is not evidence of fraud, because the time period was necessary to present a "united front" in defense of the claims. Additionally, according to Home, the admittedly "late reservation of rights" letter is not evidence of fraud, because (1) it is not clear that a letter would be required in order for Home to assert a coverage defense, and (2) if Home had really wanted to defraud CMOG, it would have relied on the letter in refusing to pay the Moloso judgment.

Home additionally asserts that the settlement negotiations do not offer evidence of fraud chiefly because the Molosos "never once offered or even implied that they would settle for an amount within The Home's policy limits." Home also asserts that its purported "failure to communicate" with CMOG about developments concerning the case is not evidence of fraud because Home did communicate with the attorney for the state and had no reason to believe that the attorney would not also report to CMOG.

We conclude that CMOG has adequately presented a factual basis to "support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 109 S.Ct. at 2631. Home's seemingly belated reservation of rights letter and its actions after the letter was sent are sufficient to compel this conclusion. At the least, CMOG should have been kept informed about the status of the case and any ongoing negotiations so that it could protect its interests.

The decision of the superior court is REVERSED.