# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 43890

PEGGY CEDILLO,

    **Plaintiff-Appellant,**

v.

FARMERS INSURANCE COMPANY OF IDAHO,

    **Defendant-Respondent.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Boise, May 2017 Term**

**2017 Opinion No. 118**

**Filed: November 29, 2017**

  **Karel A. Lehrman, Clerk**

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County.  Hon. Lynn G. Norton, District Judge.

The judgment of the district court is <u>affirmed.</u>

Runft & Steele Law Offices, Boise, for appellant. Jon M. Steele argued.

Gjording Fouser, PLLC, Boise, for respondent. Bobbi K. Dominick argued.

---

BRODY, Justice

    This is an insurance bad faith case arising out of a claim for underinsured motorist coverage. Ms. Cedillo claims the district court erred when it (1) granted summary judgment in favor of Farmers on her bad faith claim, (2) denied discovery of the entirety of Farmers' claims file and certain electronic information, and (3) denied a motion to amend her complaint to include a claim for punitive damages. We affirm the judgment of the district court on the bad faith claim and do not reach the merits of Ms. Cedillo's other claims. We deny Farmers' request for attorney's fees, but award costs on appeal.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

    In May 2008, Peggy Cedillo was injured in a collision while riding as a passenger on the back of a motorcycle. About a year after the collision, she settled her claim against the motorcycle driver for $105,000, the total amount available under his insurance policy. Ms.

1

Cedillo married the motorcycle driver about eight months after the collision, and he is her lawyer in this lawsuit and has been designated as one of her experts.

In July 2009, about two months after settling her tort claim, Ms. Cedillo sent Farmers a letter seeking payment under the underinsured motorist portion (UIM) of her own auto policy. The UIM insuring clause stated:

> We will pay all sums which an insured person is legally entitled to recover as damages from the owner or operator of an UNDERinsured motor vehicle because of bodily injury sustained by the insured person.

Ms. Cedillo told Farmers that her medical bills totaled $53,048.62, and she demanded payment of policy limits of $500,000 and resolution of the claim within thirty days.

Shortly after receiving Ms. Cedillo's letter, Farmers requested that she sign a medical release authorizing the company to obtain her medical records. She signed the release, but limited it to medical information related to the motorcycle collision by adding the notation "(information pertaining to the accident/injury occurring 5-25-08 only)."

On August 25, 2009, a few days before the thirty-day demand period was up, Farmers sent Ms. Cedillo a $25,000 check with a letter stating that the check represented their valuation of her UIM claim and took into account the $105,000 she received from the motorcycle driver's insurance company. The policy also contained a provision allowing a reduction in the amount of UIM coverage based on third party liability payments:

> The amount of UNDERinsured Motorist Coverage we will pay shall be reduced by the amount of any other bodily injury coverage available to any party held to be liable for the accident.

Farmers stated that its valuation did not include lost wages because her letter did not support a wage claim and she had not requested lost wages. The letter stated she could submit any additional information she had to support her claim.

There was no further contact between the parties for a period of about six months. On March 30, 2010, Ms. Cedillo sent Farmers another letter informing it that she needed surgery to remove or block the occipital nerves because of ongoing headaches and neck pain. She estimated the procedure to cost $25,000. She also stated that she may need another surgical procedure to cover numbness and tingling in her hands. She stated she did not have a cost estimate for that procedure. She again made a demand for policy limits of $500,000.

2

Farmers responded to Ms. Cedillo's March 2010 demand approximately two weeks later by sending her a letter stating that it was not in a position to accept or deny the demand. Farmers stated that it needed to obtain the records pertaining to recent medical treatment and that it needed records for five years prior to the collision. Farmers noted in the letter that there may be relevant pre-accident records. Farmers also stated that it had not received any additional documentation regarding a wage claim.

On May 7, 2010, Farmers sent Ms. Cedillo a letter advising her that it had obtained her medical records from the physician she said had recommended the nerve block/removal surgery. Farmers obtained the records using the limited release Ms. Cedillo had previously provided. Farmers stated that the doctor's records did not document the need for surgery and asked her to provide any additional documentation that she might have. Farmers also stated that the records it had obtained did not support changing its evaluation of her claim and again requested that she sign a medical release so that it could request pre- and post-accident records. It also requested that she provide a list of her treatment providers. Ms. Cedillo provided the release on July 2, 2010, approximately two months later. On July 16, 2010, Farmers sent Ms. Cedillo another letter again requesting a list of treatment providers.

On September 3, 2010, Ms. Cedillo sent Farmers another demand for policy limits. In her letter, she outlined her injuries, the impact those injuries had on her daily life, including her inability to work, and her medical bills to date (a little over $56,000) and the difficulties she was having paying those bills. She included adjusted gross wage information from past years (selected information from past tax returns) and provided a list of past treatment providers as well as new treatment providers. She stated that she had not received Farmers' August 25, 2009, request for wage information.

Farmers responded to Ms. Cedillo's demand on September 24, 2010. It requested Ms. Cedillo's complete tax returns so that it could evaluate her claim for lost wages. It also stated that it needed the medical records for new medical bills she had provided (it said it would request the records) and records documenting the need for surgery since the records they had obtained did not support her claim. Farmers also pointed out that the August 24, 2009 request for wage information was included with the $25,000 check which she had cashed. Farmers stated that it was not in a position to accept or deny the claim and told her that she would need to undergo an independent medical examination to determine the cause and extent of her injuries pre- and post

3

accident. Ms. Cedillo responded to Farmers about a month later, giving it updated information on a bill and telling it to let her know the date and location of the medical examination.

In December 2010, Farmer's attorney contacted Ms. Cedillo to set up the independent medical examination. Dr. Richard Wilson did the exam on April 19, 2011, and issued a report outlining his findings. He attributed her ongoing pain symptoms to stress rather than a nerve issue requiring surgery and apportioned the necessity of the neck fusion surgery she had undergone in 2008 after the collision equally between pre-existing conditions (she had been involved in two prior collisions) and the motorcycle accident at issue. Farmers advised Ms. Cedillo on May 5, 2011 that it was not changing its evaluation of her claim. The parties proceeded to arbitration.

While the arbitration was pending, Ms. Cedillo underwent a second neck fusion surgery (a level above the original fusion) in February 2012. In May 2012, she had surgery on her right shoulder to debride the rotator cuff and labral tears and bursal adhesions. In October 2012, Farmers had Dr. Wilson perform another independent medical examination to evaluate Ms. Cedillo's condition following these surgeries. Dr. Wilson did not attribute the need for the surgeries to the collision. Nonetheless, on October 18, 2012, Farmers paid Ms. Cedillo an additional $155,000 under the UIM policy. Farmers made the payment approximately one month before the arbitration hearing took place.

The arbitration hearing took place on November 21-22, 2012. The parties stipulated prior to the arbitration that the arbitrator would not address setoff issues in his initial determination. The arbitrator issued a written decision detailing his findings and valuation of damages. He apportioned 100% of the cost of the first neck surgery and the shoulder surgery to the motorcycle collision, contrary to Dr. Wilson's testimony. With respect to the second neck surgery, he apportioned 25% of the cost to preexisting conditions and 75% of the cost to the motorcycle collision. His valuation shows that he also disallowed 25% of general damages for the preexisting neck condition which necessitated the second fusion. With respect to the lost income claim, he found that Ms. Cedillo had carried her burden of proving lost income through Nancy Collins, a vocational rehabilitation counselor. Although Farmers presented an expert who testified that Ms. Collins' methodology failed to take into account the economic recession that hit the real estate market during the time period at issue (Ms. Cedillo was a realtor) and that she believed economic loss should be limited to periods of time where Ms. Cedillo was recovering

from surgery, the arbitrator found that Farmers' expert failed to quantify the amount of the loss. The arbitrator valued Ms. Cedillo's claim as follows:

- Medical Expenses $121,700.12
- Lost Income <u>$135,000.00</u>

      Total Economic Loss $256,700.12

- Noneconomic Damages <u>$150,000.00</u>

      Total Value of Claim $406,700.12

Following his initial determination, the arbitrator re-evaluated the award to take into account setoffs for the settlement with the motorcycle driver (deducted $105,000), payments made by Farmers (deducted $25,000 and $155,000), the apportionment of costs for the second neck surgery, deductions for collateral source payments (contractual discounts taken by the medical providers) and other minor deductions. The arbitrator also found that Ms. Cedillo provided Farmers with enough information to trigger an obligation to investigate her claim and determine their rights and obligations as of July 28, 2009. The arbitrator found that prejudgment interest started to run on August 25, 2009, the date Farmers provided Ms. Cedillo with its initial valuation of her claim. After all of the deductions and calculations of prejudgment interest, the arbitrator determined that the principal amount still owed by Farmers was $100,332.95 and the prejudgment interest owed was $103,135.46.

Ms. Cedillo subsequently filed a petition in district court to confirm the arbitration award. Farmers filed a motion with the arbitrator to reconsider the prejudgment interest award, because it had paid $100,333 to Ms. Cedillo before the arbitration award was made final. The arbitrator issued an amended final order of $101,948, concluding that Farmers' $100,333 payment was applied to the prejudgment interest and that $2,803 interest had accrued on the damage award. When Farmers issued the final check to Ms. Cedillo, it included her health insurance company (who apparently may have had a lien or subrogation interest on the money) as a co-payee.

In November 2013, the district court confirmed the arbitrator's amended final award and awarded Ms. Cedillo $121,007 in attorney's fees. Farmers appealed. In March 2015, this Court affirmed the district court's confirmation of the arbitration award and awarded Ms. Cedillo additional attorney's fees and costs on appeal. *Cedillo v. Farmers Ins. Co.,* 158 Idaho 154, 166, 345 P.3d 213, 225 (2015) ("*Cedillo I*").

Meanwhile, Ms. Cedillo also pursued a bad faith claim against Farmers in the district court. Prior to this Court's consideration of the arbitration award, Ms. Cedillo filed a motion with the district court to compel Farmer's production of her entire claim file and other answers to discovery. The district court stayed the ruling on that motion pending resolution of the arbitration dispute on appeal. Following this Court's decision in *Cedillo I*, Ms. Cedillo renewed her motion to compel. Shortly before the hearing, Farmers produced a large volume of documents (about 5,000 pages). Because of the inability to review the documents in advance of the hearing, the district court granted the motion to compel in general and set a hearing date to resolve any continuing discovery issues that Ms. Cedillo wanted to raise. The court's order resulted in further productions, but there remained a dispute about whether certain documents were exempt from disclosure under the work product doctrine and attorney-client privilege. Accordingly, four days before the scheduled hearing, Ms. Cedillo moved for an *in camera* review of documents and Farmers filed under seal a copy of all documents it claimed were privileged. The district court then issued its second decision on the renewed motion to compel. This decision discussed case law on the issue and outlined the court's page-by-page review of each document withheld or redacted by Farmers under a claim of privilege. Ultimately, many of the documents were ordered to be produced, and others were deemed privileged from disclosure. Thereafter, Farmers moved for summary judgment on the bad faith claim, and Ms. Cedillo moved to amend her complaint to add claims for punitive damages and negligent adjustment of her UIM claim. The district court granted Ms. Cedillo's motion to amend her complaint to add a negligent adjustment claim, but denied her motion to amend to add a punitive damages claim. The district court granted Farmers' motion for summary judgment on the bad faith claim. Ms. Cedillo declined to amend her complaint to add a negligent adjustment claim. She appealed to this Court.

## II. STANDARD OF REVIEW

"On appeal from the grant of a motion for summary judgment, this Court utilizes the same standard of review used by the district court originally ruling on the motion." *Fragnella v. Petrovich*, 153 Idaho 266, 271, 281 P.3d 103, 108 (2012). "Summary judgment is appropriate if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (internal quotations omitted).

## III. ANALYSIS

**A.     We decline to address Ms. Cedillo's discovery issues on appeal.**

Ms. Cedillo argues that the district court erred in exempting certain documents from discovery. Her contentions are that (1) Farmers waived any objection or privilege claim by failing to respond to discovery requests in a timely manner, (2) Farmers' privilege log did not set forth sufficient facts to substantiate its privilege claims, (3) Farmers gave insufficient discovery responses related to electronically stored information ("ESI"), and (4) withheld and redacted papers from Farmers' claim file were not protected by the work product doctrine or attorney-client privilege.

Ms. Cedillo raises some important questions about discovery which this Court has not yet addressed, including whether an untimely objection is waived and the scope of the attorney-client privilege in UIM cases. She fails to support her claims, however, with arguments establishing prejudice. "[B]ecause an appellant can only prevail if the claimed error affected a substantial right, the appellant must present some argument that a substantial right was implicated." *Hurtado v. Land O'Lakes, Inc.*, 153 Idaho 13, 18, 278 P.3d 415, 420 (2012). We recently re-iterated this point in *Ellefson v. Palmer*, No. 43712, 2017 WL 2822477, at *4 (Idaho June 30, 2017):

> The Idaho Rules of Civil Procedure provide that '[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.' I.R.C.P. 61. Consequently, we have held that when an appellant fails to present argument that a substantial right was implicated she waives the issue.

*Id.*

Here, Ms. Cedillo argues that the district court abused its discretion in various discovery rulings. Her claims are wide-ranging, but she does not provide any argument on appeal as to how these rulings prejudiced her case nor is it obvious from the record.

On the day of the hearing on Ms. Cedillo's renewed motion to compel, she filed the affidavit of an insurance bad faith expert stating that he needed further discovery from Farmers to determine whether the insurer had acted in bad faith. The affidavit stated that the expert needed the paper and electronic claims file to address, among other things, whether the claim was "fairly debatable." Specifically, it stated that he needed to know "who made claims decisions, when they were made, what the decisions were based upon, what investigation was done or should have been done, and how these decisions were communicated to the policy

7

holder." The expert also explained that in all the cases he had been involved with in the past he had been provided with the complete paper and electronic claims file subject to certain well defined exceptions, namely the attorney/client privilege and work product privilege.

Although the district court did not consider the expert's affidavit because it was untimely, it granted Ms. Cedillo's renewed motion to compel. Farmers had produced a large volume of documents (nearly 5,000 pages based on Farmer's second set of supplemental answers) shortly before the hearing on the motion and had a change of counsel, so the district court entered a general order requiring compliance with the discovery requests and scheduled a follow-up hearing about thirty days later to address any unresolved issues. The district court directed the parties to work together to continue to resolve issues, including those related to requests for electronic information.

Six days before the scheduled follow-up hearing, Ms. Cedillo filed a motion asking the district court to conduct an in camera review of all documents that Farmers claimed were privileged. The district court granted the motion and subsequently issued a detailed memorandum decision specifying documents to be produced, documents to be redacted/unredacted, and documents to be protected. The district court also awarded Ms. Cedillo $15,000.00 in attorney's fees as a sanction for having to bring the renewed motion to compel. When the discovery dust settled, thousands of pages from Farmers' claims file were produced.

Ms. Cedillo's expert issued his report ten days after Farmers issued its fifth supplemental answers. Importantly, the expert's report did not indicate that there was a lack of sufficient information to formulate his opinions or qualify his opinions in any way. He also did not identify a lack of information at any point during his deposition. Additionally, there is no argument in briefing submitted by Ms. Cedillo on appeal asserting prejudice from the district court's discovery rulings. There is certainly no argument that Ms. Cedillo's expert did not have sufficient information to formulate his opinions as to whether Ms. Cedillo's underlying UIM claim was fairly debatable. Without argument connecting the allegations of error with prejudice to a substantial right, we will not consider the discovery issues Ms. Cedillo has raised.

**B.** **The district court did not err in granting Farmers' motion for summary judgment on the bad faith claim.**

Farmers moved for summary judgment, asserting that Ms. Cedillo could not make out a prima facie case of bad faith because the evidence showed that the claim was fairly debatable. The district court granted Farmers' motion, concluding that "fairly debatable" contemplated not

just whether the claim should be paid, but also involved whether there was a dispute about the amount to be paid. The district court determined that Farmers never disputed Ms. Cedillo's eligibility for some payment under the policy (even sending payment of $25,000 within a month after it was notified), but that the dispute centered around the value of her claim. To support this determination, the district court pointed to the facts that Ms. Cedillo sought full payment of her entire $500,000 policy, but could only show $53,048 in economic damages; that Ms. Cedillo was not forthcoming in providing information related to subsequent surgeries or wage demands; and that Ms. Cedillo had a complicated medical history and pre-existing injuries which, in fact, led to the apportionment of certain medical expenses. The district court thus concluded that Ms. Cedillo's claim was fairly debatable.

Ms. Cedillo contends that her claim was not fairly debatable because Farmers possessed sufficient information to value her claim, the Arbitrator ruled in her favor, her expert concluded that her claim was not fairly debatable, and Farmers behaved badly. To establish a bad faith claim, the plaintiff must show that "1) the insurer intentionally and unreasonably denied or withheld payment; 2) the claim was not fairly debatable; 3) the denial or failure to pay was not the result of a good faith mistake; and 4) the resulting harm is not fully compensable by contract damages." *Robinson v. State Farm Mut. Auto. Ins. Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2001). Fairly debatable means that there was a reasonable dispute or legitimate question over the "eligibility, amount or value of the claim." *Id.* at 177–78, 45 P.3d at 833–34.

As indicated above, this Court reviews a district court's summary judgment determination utilizing the same standard used by the district court: whether there is a genuine issue of material fact that entitles the moving party to judgment as a matter of law. *Fragnella*, 153 Idaho at 271, 281 P.3d at 108. "A mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact for the purposes of summary judgment. Instead, the nonmoving party must respond to the summary judgment motion with specific facts showing there is a genuine issue for trial." *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009) (internal citations omitted).

Ms. Cedillo does note, and the district court agreed, that eligibility and coverage were never issues in this case. There is no evidence that Farmers contested Ms. Cedillo's coverage, or that she was owed damages under her UIM policy. But fairly debatable also includes a dispute about the amount of claimed damages, and the evidence indicates that there has been a

continuing dispute about the extent of damages. In fact, the arbitrator actually reduced his award to take into account a preexisting condition. Ms. Cedillo does not point to specific facts to support her assertion that her claim was not fairly debatable. She relies heavily on the report of her bad faith expert who concluded that Farmers' behavior in relation to Ms. Cedillo's claim was "an extreme departure from norms in the insurance industry" in Idaho. However, most of Ms. Cedillo's expert's analysis concerned the manner in which Farmers handled the claim and Farmer's response to Ms. Cedillo generally. Poor claims management standing alone is not enough to make out a bad faith claim. It may be the basis of a negligent adjustment claim, which is why the district court granted Ms. Cedillo's motion to amend her complaint to include such a claim. In order to prevail on a bad faith claim, an insured must also be able to establish that her underlying claim was not fairly debatable. Ms. Cedillo's expert made only two references to the fairly debatable element of Ms. Cedillo's bad faith claim, and these references were conclusory and vague: "While some individual acts are based on fairly debatable issues, others were not . . . [w]hile some specific decisions could be characterized as fairly debatable, others were not . . . ." Neither Ms. Cedillo nor her expert pointed to specific facts that would create a genuine issue of material fact as to the fairly debatable element of her bad faith claim against Farmers. General conclusions about Farmer's conduct do not provide the facts needed to overcome summary judgment on the "fairly debatable" element. Thus, the district court did not err in granting Farmers' motion for summary judgment.

**C.**     **The district court did not err in denying Ms. Cedillo's motion to amend her pleadings to include a claim for punitive damages.**

Ms. Cedillo argues that the district court erred in refusing to allow her to add a punitive damages claim. Given our ruling today that Ms. Cedillo's bad faith claim was properly dismissed on summary judgment and her filing of a notice declining to amend her complaint to add a claim for negligent adjustment, this issue is moot, and we decline to reach the merits. *See, e.g.*, *Zylstra v. State*, 157 Idaho 457, 468, 337 P.3d 616, 627 (2014) (declining to reach statute of limitations defense where tort claim defeated on issue of causation).

**D.**     **Neither party is entitled to attorney's fees on appeal.**

Ms. Cedillo seeks attorney's fees on appeal based on Idaho Code section 41-1839 and the public policy underlying Idaho Code section 41-2502, which requires UIM insurance. Farmers seeks attorney's fees based on Idaho Code section 12-121. Farmers is the prevailing party, but

we do not find that Ms. Cedillo's appeal was "frivolous" or without foundation as required by Idaho Code section 12-121. As such, Farmers' request for attorney's fees is denied.

## IV. CONCLUSION

We affirm the judgment of the district court. Farmers is awarded costs on appeal.

Justices EISMANN, JONES and HORTON CONCUR.


BURDICK, C.J., dissenting.

I respectfully dissent from the majority opinion. I am troubled by the Court's holding that Cedillo's discovery arguments need not be addressed because, as the majority maintains, Cedillo has waived these arguments for appellate review. Because the majority fails to address these key issues and their impact on the summary judgment and punitive damages issues in a meaningful way, I must dissent.

The majority turns to the harmless error doctrine to reach its conclusion that Cedillo has not shown the district court's discovery rulings implicate her substantial rights. The harmless error doctrine is set forth in Idaho Rule of Civil Procedure 61, which, in relevant part, instructs that, "At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Applying the harmless error doctrine, this Court has "held that when an appellant fails to present argument that a substantial right was implicated she waives the issue." *Ellefson v. Palmer*, No. 43712, 2017 WL 2822477, at *4 (Idaho June 30, 2017). The majority is correct in its recitation of these principles. But the majority is incorrect in the way these principles apply to the case here.

I start by noting that my research shows this Court has never applied the harmless error doctrine to discovery issues similar to those before this Court today. We did apply the harmless error doctrine to a request to reopen discovery in *West v. El Paso Products Co.*, 122 Idaho 133, 135, 832 P.2d 306, 308 (1992). There, we held that "the error, if any, occasioned by the failure of the court to rule on the appellants' request to reopen discovery was harmless because the sought after information was not relevant . . . ." *Id.* The same cannot be said in this case, as Cedillo's requested discovery for the full claim file is undeniably relevant. *E.g.*, *Allstate Indem. Co. v. Ruiz*, 899 So. 2d 1121, 1124 (Fla. 2005) (noting that the claim file "is certainly material and relevant, if not crucial, to any intelligent and just resolution of the bad faith litigation"); *Brown v. Sup. Ct.*, 670 P.2d 725, 734 (Ariz. 1983) ("The claims file is a unique, contemporaneously

11

prepared history of the company's handling of the claim; in an action such as this the need for the information in the file is not only substantial, but overwhelming.").

I observe that we have applied the harmless error doctrine to evidentiary rulings, stating that, with regard to evidentiary rulings, "[e]rror is prejudicial only if it could have affected or did affect the outcome of the trial." *Burgess v. Salmon River Canal Co.*, 119 Idaho 299, 306, 805 P.2d 1223, 1230 (1991). Undoubtedly, discovery is a process by which the parties obtain evidence. But evidence can only affect the outcome of litigation if the evidence *is actually* obtained. Accordingly, the harmless error doctrine is improvidently applied in this case. Indeed, given discovery's critical role in our litigation system, some courts presume prejudice when the discovery rules are violated. *E.g.*, *Scott v. Greenville Hous. Auth.*, 579 S.E.2d 151, 158 (S.C. Ct. App. 2003) ("Discovery is the quintessence of preparation for trial and, when discovery rights are trampled, prejudice must be presumed.").

I am unable to see how the majority concludes Cedillo's arguments on the discovery rulings implicate anything less than her substantial rights. Cedillo devoted approximately one-half of her argument in her opening brief to four critical issues the majority imprudently sidesteps with the harmless error doctrine. Those issues are whether: (1) Farmers' discovery responses and objections, which did not comply with Idaho Rules of Civil Procedure 33 and 34, were waived as untimely; (2) Farmers met its burden under Idaho Rule of Civil Procedure 26(b)(5)(A) to support its position that more than 140 documents were exempt from discovery as privileged; (3) Farmers' responses to Cedillo's request for electronically stored information were sufficient under Idaho Rule of Civil Procedure 34; and (4) documents in Cedillo's claim file are exempt from discovery under the attorney-client privilege or the work product doctrine.

The record unequivocally demonstrates that Farmers did not comply with the relevant Idaho Rules of Civil Procedure. Idaho Rule of Civil Procedure 33(b), which governs responses to interrogatories, required Farmers to "serve the original answers, and objections if any, within 30 days after the service of the interrogatories." Also, Idaho Rule of Civil Procedure 34(b)(2), which governs responses to requests for production, required Farmers to "respond in writing within 30 days after being served." Cedillo served Farmers with her discovery requests on August 20, 2013. Farmers did not timely respond. Cedillo contacted Farmers several times concerning its failure to respond. Cedillo even gave Farmers several extensions by which to

respond. But Farmers continuously failed to respond, and thus Cedillo filed two motions to compel—one on November 25, 2013, and the other on May 28, 2015.

Farmers' failure to timely respond implicates Cedillo's substantial rights in this case. The Idaho Rules of Civil Procedure grant Cedillo the ability to discover information relevant to her claims, a procedure fundamental to the litigation process. *See Edmunds v. Kraner*, 142 Idaho 867, 873, 136 P.3d 338, 344 (2006) ("The purpose of our discovery rules is to facilitate fair and expedient pretrial fact gathering."). As stated, the Idaho Rules of Civil Procedure required Farmers to timely respond to Cedillo's discovery requests. I.R.C.P. 33(b), 34(b)(2). It is both undisputed and clear from the record that Farmers failed to do so, causing Cedillo to file two motions to compel, which thereby increased Cedillo's legal expenses, generated and protracted litigation, and resulted in Cedillo obtaining less discovery than she requested. The district court even stated that "it is difficult, if not impossible, to determine what has been produced and what has not; or what is outstanding under which discovery request. This makes it difficult for the Court to issue a specific and cogent order." All the while, Cedillo was attempting to vindicate her claims without all the information, and Farmers, advantaged by having all the information, was mounting its defense. Thus, the delay of discovery in this case prejudiced Cedillo.

Another problem I have with the majority's decision to overlook Farmers' untimely discovery responses and objections is that the district court specifically refused to allow Cedillo to file an untimely declaration with her renewed motion to compel. In that declaration, Cedillo's expert, Irving "Buddy" Paul, testified that more discovery was necessary to adequately evaluate Cedillo's claims. The testimony was that:

> In order to form an opinion on the subjects listed above, I need to know who made claims decisions, when they were made, what the decisions were based upon, what investigation was done or should have been done, and how these decisions were communicated to the policyholder, Peggy Cedillo, the plaintiff.
>
> . . . .
>
> In summary, then, in my experience courts have always given me access to written or electronic records that constitute the best evidence as to why and how the carrier made the decisions it made. In this case I need to know how when and why Farmers reached the valuations it did.

But the district court declined to consider Cedillo's expert declaration because it was untimely. I am troubled by the district court's decision to allow a plethora of untimely discovery responses and objections from Farmers, but to simultaneously disallow one untimely declaration

13

from Cedillo on the critical issue of whether she even had enough information to fully evaluate her claims against Farmers. At the very least, if the district court permitted Farmers' untimely discovery responses and objections, it should have permitted Cedillo's untimely expert declaration on the very issue of the effect of untimely discovery on Cedillo's case. After all, what is sauce for the goose is sauce for the gander. Should not this wise adage apply here, where the goose is an insurance company and the gander is its injured insured?

Even looking beyond the prejudice that ensued from the untimely discovery, I cannot see how Cedillo's arguments concerning Farmers' privilege log do not illustrate prejudice. Cedillo maintains that Farmers' privilege log, which claimed over 140 documents were exempt from discovery as privileged, denied her the ability to effectively pursue her claims because she maintains that these documents were in fact discoverable. Denying Cedillo relevant and discoverable information hinders her ability to vindicate her rights and thus illustrates prejudice. Indeed, as Cedillo explains, "There is no other way for Cedillo to get this information as it is solely in possession of Farmers." Moreover, Cedillo contends the privilege log does not comply with Idaho Rule of Civil Procedure 26(b)(5)(A), which requires:

> When a party withholds information otherwise discoverable under these rules by claiming it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

Cedillo asserts that Farmers failed to comply with Rule 26(b)(5)(A). First, Farmers "failed to provide any facts that could have assisted the District Court in determining whether any privilege exists." And thereafter, even though Farmers later produced a supplemental privilege log with more detail, Farmers still did not provide "a detailed description of the materials in dispute and state specific and precise reasons for their claim of protection from disclosure." As Cedillo elaborates, Farmers offered only a "blanket assertion by its attorney that these papers were privileged. Farmers provided no details surrounding its investigation and handling of Cedillo's claim and, therefore, no facts on which its claim of privilege were based." Taking Cedillo's arguments as true illustrates that she was wrongly denied over 140 discoverable documents, and one is left only to speculate on how those documents could have impacted the district court's ruling on summary judgment and punitive damages.

14

Further, I question whether these documents were improperly designated as privileged. Farmers asserted both the attorney-client privilege and the work product doctrine. The attorney-client privilege protects confidential communications between a client and an attorney "made for the purpose of facilitating the rendition of professional legal services to the client . . . ." I.R.E. 502. A quasi-fiduciary relationship exists between the insurer and the insured. 45 C.J.S. Insurance § 584 (2017); *see also Reynolds v. Am. Hardware Mut. Ins. Co.*, 115 Idaho 362, 365, 766 P.2d 1243, 1246 (1988); *White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 97–99, 730 P.2d 1014, 1017–19 (1986). Thus, when the insurer's attorney investigates the claim and is not specially hired to provide coverage advice to the insurer, the insurer's attorney is viewed as simultaneously representing the insured while investigating the claim. *See Hilborn v. Metro. Grp. Prop. & Cas. Ins. Co.*, No. 2:12-CV-00636-BLW, 2013 WL 6055215, at *3 (D. Idaho Nov. 15, 2013); *Cedell v. Farmers Ins. Co. of Wash.*, 295 P.3d 239, 246–47 (Wash. 2013). It is in this situation that a "presumption of discoverability" exists, entitling the insured to full access of the claims file. *Hilborn*, 2013 WL 6055215, at *2.[1] But this presumption does not vitiate the attorney-client privilege in bad faith insurance cases. Rather, it aligns with the attorney-client privilege in general, as we have long recognized that "[t]he burden of showing information is privileged, and therefore exempt from discovery, is on the party asserting the privilege." *Kirk v. Ford Motor Co.*, 141 Idaho 697, 704, 116 P.3d 27, 34 (2005) (citing *Ex parte Niday*, 15 Idaho 559, 563–64, 98 P. 845, 846–47 (1908)). In this context, the insurer can overcome the presumption of discoverability and meet its burden to establish the privilege by showing that "its attorney was not engaged in the quasi-fiduciary tasks of investigating and evaluating or

---

[1] While this presumption has been limited and not extended to the UIM context, *Cedell*, 295 P.3d at 245–46, Idaho has not spoken on this issue. Even so, it is widely accepted that bad faith defenses made to deny insurance claims are not exempt from discovery under the attorney-client privilege. *Hutchinson v. Farm Family Cas. Ins. Co.*, 867 A.2d 1, 6-7 (Conn. 2005) (stating that attorney-client privilege does not apply "when a communication was made for the purpose of evading a legal or contractual obligation to an insured without reasonable justification"); *Allstate Ins. Co. v. Madden*, 601 S.E.2d 25, 39 (W. Va. 2004) (explaining that bad faith defenses to coverage constitutes civil fraud vitiating the attorney-client privilege); *Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154, 157 (Ohio 2001) (stating that communications showing lack of good faith are not privileged); *Central Constr. Co. v. Home Indem. Co.*, 794 P.2d 595, 598 (Alaska 1990) (noting that services in aid of "bad faith breach of a duty are not protected"); *Zurich Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 524 N.Y.S.2d 202, 203 (N.Y. App. Div. 1988) (explaining that allegation of breach of insurer's fiduciary duty vitiates privilege). Were this standard to apply, I would find it satisfied. As Cedillo's expert testified, Farmers (1) engaged in behavior that was "an extreme deviation from industry standards"; (2) acted "unconscionabl[y]"; (3) acted "unreasonably and intentionally delayed payment to Ms. Cedillo of portions of her claim"; and (4) "violated the following provisions of Idaho Code: IC 41-1329(3), (4), (6) and (7)."

15

processing the claim, but was instead providing the insurer with counsel as to its own potential liability." *Hilborn*, 2013 WL 6055215, at \*2 (quoting *Cedell*, 295 P.3d at 246).

*Hilborn* illustrates this presumption well. The insurer's attorney in *Hilborn* was "engaged in the quasi-fiduciary tasks of investigating and evaluating or processing the claim." *Id.* at \*3. Because the insurer's attorney was not acting in a privileged capacity, the *Hilborn* court presumed the insurer "must turn over its entire claims file, and will order it to do so." *Id.* Likewise, in this case, Farmers conceded in a request for admission that its attorney was not specially hired to provide coverage advice, but instead was involved in the routine claim handling and investigation work. The district court recognized this fact in its order on Cedillo's renewed motion to compel. Therefore, Farmers' attorney was not acting in a privileged capacity to trigger the attorney-client privilege.

Neither does the work product doctrine apply. The work product doctrine exempts from disclosure in discovery "documents and tangible things . . . prepared in anticipation of litigation . . . ." I.R.C.P. 26(b)(3). The work product doctrine may be overcome by a showing of substantial need for the information and that the party is unable without undue hardship to obtain the information elsewhere. *Id.* The work product doctrine does not apply where, as here, key mental impressions are disputed and the need for the information is substantial. *See Hilborn*, 2013 WL 6055215, at \*3 (quoting *Holmgren v. State Farm Mut. Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992)). Here, the work product doctrine is inapplicable because critical mental impressions are disputed, and Cedillo's need for the information is substantial. Specifically, because Cedillo asserts a bad faith claim, the mental impressions of Farmers are directly at issue, and Cedillo has repeatedly argued the disputed discovery is necessary. *Cf. Holmgren*, 976 F.2d at 577 (explaining that, in bad faith claims, the mental impressions and opinions of the insurer are directly at issue). But even if the work product doctrine were to apply, I would conclude Cedillo had overcome it. As she contends, "There is no other way for Cedillo to get this information as it is solely in possession of Farmers." *Cf.* I.R.C.P. 26(b)(3) (explaining that substantial need and undue hardship are sufficient to overcome work product doctrine).

Cedillo concludes her brief by arguing that the portions of her claim file she obtained in discovery "documents Farmers' deliberate, lengthy, and extreme efforts to ignore, delay, deny, and defend against Cedillo's valid UIM claim." She then "urges this Court to order the production of Farmers' entire claim file." Because summary judgment was granted to Farmers

16

for lack of a triable issue of fact on the evidence submitted, I am troubled by the majority's holding that Cedillo was not prejudiced by Farmers' conduct in discovery and, further, its conclusion that no triable issue of fact exists notwithstanding that Cedillo was denied access to all of the facts. The dismal effect of this plays out in the majority's summary judgment analysis, where it concludes Cedillo and her expert, Irving "Buddy" Paul, were able to provide only "[g]eneral conclusions about Farmers' conduct," which, as the majority continues, "do not provide the facts needed to overcome summary judgment . . . ."

The majority's statement concerning Paul's report oversimplifies Paul's opinions. Paul opined as follows:

- Farmers' investigation was slow and sloppy by any measure of industry standards. I will give some examples. Farmers' file and actions claim that it did not know whether Mr. Steele had paid any of Ms. Cedillo's medical bills until his testimony in the arbitration. This was objective information very easy to obtain. Farmers could have and should have obtained this information much earlier. It was not a valid excuse for delay in evaluation.

- [T]ime after time up to October 18, Farmers conducted file reviews and concluded nothing more was owed. What changed between September 18 and October 18? Or August, July, June, May, and April . . . for that matter? Ms. Cedillo had her second surgery on February 15, 2012. While I will agree that both parties have a role in the timing of a case, I am firmly of the opinion that Farmers did not perform an adequate or timely evaluation of damages in this case, and thereby caused significant delay . . . first in delaying payment of the $155,000, but also in consistently undervaluing the case, and putting up excuses through arbitration.

- I have already indicated that Farmers' overall behavior in nitpicking every ruling and in fighting discovery was an extreme deviation from industry standards. There is also evidence that Farmers' behavior was the result of malice and constituted outrageous conduct. After all was said and done, the arbitrator had ruled and Farmers was finally going to pay, it insisted on putting Blue Cross on the check. This, in my opinion, was unconscionable. While putting potential lien holders on SETTLEMENT checks is sometimes appropriate, that is not the case where there has been an award by a tribunal. The Farmers' file makes note that this was an old case; some charges may have been compromised or even written off. By putting Blue Cross on the payment check, it would force Ms. Cedillo to go to Blue Cross and potentially wake up sleeping dogs. The carrier does have a right to be free of liens, but the way to do so would be to make the check payable to Mr. Steele's trust account and insist that liens be satisfied prior to disbursement. This would have protected both Farmers and Cedillo. Instead, Farmers again chose to put its own interest ahead of its insured.

17

- Taken as a whole, Farmers unreasonably and intentionally delayed payment to Ms. Cedillo of portions of her claim.

- In my opinion, the conduct of Farmers violated the following provisions of Idaho Code: IC 41-1329(3), (4), (6) and (7).

Paul's opinion concerning Farmers' conduct in discovery is particularly important. In that regard, Paul opined as follows:

> I was asked to review Farmers' discovery objections and have seen the courts' rulings on discovery. I have been involved on both sides of well over 100 cases with allegations of bad faith, and have *never seen a carrier be less forthcoming or cooperative in producing its basic claims file*. Taken together with asking for reconsideration and appeal at every turn, it is clear Farmers had no interest in being fair to its own insured.

The above is relevant to the rulings on the discovery issues, summary judgment, and punitive damages. Paul is qualified to render the above opinions. Since 1980, Paul has practiced insurance law. He has served as an adjunct professor of law, teaching a law school course entitled "Insurance and Bad Faith Law and Litigation." He has served as an expert witness in over eighty insurance-related cases and taught a number of insurance law seminars. Nevertheless, the majority overlooks both Paul's testimony and the prejudice that ensued to Cedillo from the discovery rulings below.

The majority further observes that Paul's testimony focused largely on "the manner in which Farmers handled the claim and Farmers' response to Ms. Cedillo generally. Poor claims management standing alone is not enough to make out a bad faith claim." In my opinion, that statement oversimplifies Paul's testimony and results in a misapplication of the summary judgment standard, which requires us to construe all facts in "the light most favorable to the non-moving party and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party." *Greenfield v. Smith*, 162 Idaho 246, ___, 395 P.3d 1279, 1282 (2017). While I thus disagree with the majority's view of Paul's testimony, I find especially problematic that the majority does not acknowledge that the lack of discovery available to Cedillo likely impacted the breadth of Paul's testimony. While the majority is correct that Paul's expert report did not comment on needing more information, Paul's affidavit—filed less than four months before his expert report was filed—expressly stated that more information was needed, as noted above.

I find my concerns to be particularly well-suited to this case, a bad faith insurance case, which requires a showing that "1) the insurer intentionally and unreasonably denied or withheld payment; 2) the claim was not fairly debatable; 3) the denial or failure to pay was not the result of a good faith mistake; and 4) the resulting harm is not fully compensable by contract damages." *Robinson v. State Farm Mut. Auto. Ins. Co.*, 137 Idaho 173, 176, 45 P.3d 829, 832 (2002). This Court has previously recognized the disparities plaguing bad faith claims:

> Because of the disparity in bargaining power and the nature of the contract, the insurer receives both premium and control. In first-party situations the insurer sets the conditions for both presentment and payment of claims. In both first- and third-party situations the contract and the nature of the relationship effectively give the insurer an almost adjudicatory responsibility. The insurer evaluates the claim, determines whether it falls within the coverage provided, assesses its monetary value, decides on its validity and passes upon payment. Although the insured is not without remedies if he disagrees with the insurer, the very invocation of those remedies detracts significantly from the protection or security which was the object of the transaction. Thus, the insurance contract and the relationship it creates contain more than the company's bare promise to pay certain claims when forced to do so; implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured.

*White*, 112 Idaho at 98, 730 P.2d at 1018 (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986) (citations omitted))).

For the reasons above, I cannot endorse the majority's reliance on the harmless error doctrine in this case, for overlooking Farmers' blatant discovery violations is sure to undermine the efficacy of our body of discovery rules. "[D]iscovery rules are not intended to encourage or reward those whose conduct is inconsistent with that purpose," *Edmunds*, 142 Idaho at 873, 136 P.3d at 344, but in this case, Farmers nevertheless gets judgment in its favor despite its incredible discovery abuses. The key issues in this case were what Farmers knew, when it acquired that knowledge, and how it responded. Given the parties' disparities concerning access to relevant information and in bargaining power, full and timely discovery was essential for Cedillo, and the discovery rulings Cedillo has raised on appeal implicate her substantial rights. Because the majority fails to address these issues in a meaningful way, I must dissent.